[Cite as *State v. Murphy*, 2010-Ohio-5031.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 09CA3311 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENRY |
| Wayne Murphy, | : | |
| Defendant-Appellant. | : | **Released 9/22/10** |

_____
APPEARANCES:

George L. Davis, IV, Portsmouth, Ohio, for appellant.

Mark E. Kuhn, Scioto County Prosecutor, Pat Apel, Scioto County Assistant Prosecutor, and Danielle M. Parker, Scioto County Assistant Prosecutor, Portsmouth, Ohio, for appellee.
_____
Harsha, J.

**{¶1}** A jury convicted Wayne Murphy of aggravated robbery, felonious assault, and attempted murder as the result of a violent robbery at a grocery store. The State introduced evidence that Murphy, along with his co-defendant William Dixon, viciously assaulted a clerk in the grocery store with a hammer and then stole the clerk's wallet and the cash register. After the jury's verdict, the trial judge sentenced Murphy to a total of twenty-eight years in prison.

**{¶2}** In spite of his failure to object on the record, Murphy contends that the trial court erred by ordering him restrained during trial. The only evidence before the court at the security hearing was that Murphy was serving a life sentence for a violent robbery and rape in Kentucky. We agree that placing Murphy in restraints was error. Merely being incarcerated for other crimes does not demonstrate the exceptional

circumstances required to justify placing a defendant in shackles at his trial. Nonetheless, we hold that restraining Murphy during his trial did not amount to plain error because Murphy's restraints were hidden from the jurors' view, Murphy's attorney approved a cautionary instruction to jurors alerting them to the restraints, and the evidence upon which Murphy was convicted was substantial, i.e., it is not clear that the verdict would have been otherwise but for the error.

{¶3} Murphy also contends that the court erred by failing to sever his trial from that of Dixon. Murphy argues that he was prejudiced because (1) their defenses were mutually antagonistic; (2) he was limited on cross-examination of a State's witness concerning a redacted summary of a statement made by Dixon; and (3) Dixon's attorney improperly commented on his Fifth Amendment right to remain silent. First, we conclude that Murphy's and Dixon's defenses were inconsistent, but separate trials were not required because there was no evidence of a serious risk that Murphy would be denied a specific trial right either before or during the consolidated trial. Second, the limitation on cross-examination concerning the redacted summary was not prejudicial because it was designed to prevent Murphy from opening the door to questioning that would have led to him being implicated in the statement. And third, assuming Dixon's attorney's comment on Murphy's right to remain silent was improper, it did not amount to plain error because we cannot say that "but for" this brief remark, Murphy would have been acquitted.

{¶4} Murphy argues next that the trial court erred by allowing the State to submit evidence to the jury about a rape that occurred during the robbery in Kentucky. Evidence of the robbery clearly constituted "other acts" evidence that was admissible

under Evid.R. 404(B) for purposes of proving identity. And although evidence of the rape was not admissible under Evid.R.404(B) and should also have been excluded under Evid.R. 403(A), we conclude that the trial court's error was harmless because of the substantial evidence of Murphy's guilt.

{¶5}   Next, Murphy contends that the trial court erred by failing to grant a mistrial after the prosecutor swung a hammer within two feet of jurors during closing arguments. Because the Prosecutor's act was fair comment on blood spatter evidence presented in the trial, the court did not abuse its discretion when it denied the motion for a mistrial.

{¶6}   Finally, Murphy argues that the trial court erred by sentencing him for allied offenses of similar import committed with a single animus. We agree that the trial court erred when it sentenced Murphy separately for the crimes of felonious assault and attempted murder. These crimes are allied offenses of similar import and the evidence at best supports a single animus for both crimes. Accordingly, we remand to the trial court for re-sentencing.

## I.  Summary of Facts

{¶7}   In July 2004, Art Waddell was working the cash register at a grocery store in Franklin Furnace, Ohio. Upon seeing two males in the rear of the store at the meat counter he locked the cash register and went to help them. As he approached the meat counter he was struck in the back of the head with a hammer and rendered unconscious. He suffered serious injuries to the head, including a depressed skull fracture. The robbers made away with Waddell's wallet and the cash register, both of which contained cash.

{¶8}   After being arrested for a similar robbery in Kentucky, Murphy and Dixon were indicted for the Ohio crime, where they were charged in separate indictments with aggravated robbery, felonious assault, attempted murder, and conspiracy to commit aggravated robbery.  Prior to trial the court granted the State's motion to consolidate their trials.  The court later held a hearing on several pending defense motions, including a motion to exclude evidence of the Kentucky crime and a motion for separate trials.  The court found that evidence concerning the Kentucky robbery was admissible for purposes of demonstrating identity and denied the motions for separate trials.

{¶9}   The court also held a security hearing to determine whether Dixon and Murphy would be placed in restraints for trial.  Based on the violent nature of the crimes, the fact that both defendants were incarcerated in Kentucky on similar charges, and that jurors would know this because of the admission of "other acts" evidence, the court ordered that both defendants be placed in restraints for trial.

A.  The Trial

1.  Evidence of the Ohio Robbery

{¶10}  Art Waddell testified that he was working alone at the Blanton and Graff Grocery (B+G) in Franklin Furnace, Ohio around noon on July 5, 2004.  Waddell began his shift early because the employee on duty became ill and required hospitalization.  An ambulance picked up the sick employee and Waddell worked checking out shoppers at the cash register.

{¶11}  Shortly before the incident, Greg Russell was inside B+G playing lottery tickets.  He observed two men in the back of the store near the meat counter.  One man

with long hair was staring at him. Russell later identified this man as Murphy after seeing a picture of him on television.

{¶12} Danny Clement testified that he arrived at B+G as the ambulance was leaving with the sick employee. Clement noticed two men standing in the back of the store. He could not see their faces but he remembered one had long hair and the other had short hair. As he left the store he saw a woman he recognized standing next to a car in the parking lot. This was Tracy Chaffins, Murphy's girlfriend.

{¶13}  Waddell testified that as he was checking out customers he observed Murphy and Dixon in the back of the store in front of the meat counter. He recognized Dixon from being in the store previously and vaguely recognized Murphy, maybe having seen him once before. Waddell checked out the last customer in the store and saw that both men were still standing at the meat counter. He locked the cash register and then walked up a store aisle toward the meat counter to assist the two men.

{¶14}  Before he arrived at the meat counter, Waddell observed that Dixon was standing alone and he could not see Murphy. But he believed Murphy had not left the store because there was only one exit and it was near the cash register. Waddell thought that Murphy was either hiding or stealing. Waddell was about ten to twelve feet away from Dixon when he lost all memory and then woke up in the hospital.

{¶15}  An unknown individual walked up to the local fire station and reported that Waddell had been injured at B+G. When the ambulance crew arrived, they found Waddell perched on a stool, bleeding profusely from the head. At the hospital, medical staff determined that Waddell received multiple blows to the head including puncture

wounds that left bits of his brain in his hair.  Waddell testified that he ultimately received five blows to the head and twelve blows to his arms.

{¶16}  Jodi Conkel of the Scioto County Sheriff's Office conducted the investigation of the B+G robbery.  At the crime scene she observed blood on the floor, blood splatter, and bloody drag marks leading from the back of the store to the front, where the cash register, now missing, had been located.  She explained some of the photographs of the crime scene to the jury.  She located evidence of blood splatter, which indicated that an object was used to strike the victim.

{¶17}  At the hospital Detective Conkel attempted to interview Waddell, who initially could only communicate through vague written notes.  In some of these notes he repeatedly wrote "$1,000".  Waddell later testified that his wallet was missing after the robbery.  He said it contained $1,000, money he was planning on taking to the bank after work.

{¶18}  Detective Tim Wilson, a Kentucky police officer, contacted Detective Conkel about a week and a half later.  He told her about a robbery at a video store in Russell, Kentucky -- about fifteen miles from the B+G crime.  When Detective Wilson described the crime scene in Kentucky, Detective Conkel was struck by the similarities and went to view it.  After viewing the crime scene Detective Conkel believed the crimes were perpetrated by the same person or persons.

{¶19}  After Kentucky police arrested Dixon, Detective Conkel interviewed him about the B+G robbery.  Dixon made a statement concerning the crime.  Detective Conkel read a redacted summary of this statement at trial.  Apparently, the original

statement implicated both Dixon and Murphy in the B+G robbery, but the redacted version replaced all references to Murphy with the word "he."

{¶20}  Dixon also told Detective Conkel that hammers were used in both robberies and that she could find them at Murphy's residence.  Police went to Murphy's residence and retrieved three hammers, which they sent to a crime lab in Kentucky.  However, the test results were inconclusive for trace evidence.

### 2.  Evidence of the Kentucky Robbery

{¶21}  Melissa Ruffing testified that she was the sole employee working at the Kentucky video store on July 14, 2004.  Murphy entered the store when there were no other customers inside, walked the entire length of the store and "cased it," apparently looking for security cameras.  He then went into an employees-only storage room.

{¶22}  Ruffing was afraid to confront Murphy while she was alone in the store.  But when two women entered the store, she went to the storage room and told Murphy he could not be in there.  He cursed her and brushed past her, going back out to the video aisles.  He finished walking around the store, looked up to the ceiling, and then left.

{¶23}  Shortly afterwards Dixon walked in ostensibly to rent a video.  Dixon selected a video but did not have a membership with the store so Ruffing helped him apply for one.  He gave Ruffing his identification card and she helped him fill out a membership form.  Ruffing informed him that the store had a special deal and he was entitled to rent a second video for free.  Dixon told her that he would go ask his friend to help him pick out the second video.  Ruffing told Dixon that she would be cleaning in

one of the video aisles and pointed out where she would be when he was ready to check out the second video.

**{¶24}** As Ruffing was down on her hands and knees cleaning shelves, she heard two people whispering. She looked underneath her arm and saw a pair of boots. She was then hit in the head with a hammer. Murphy grabbed her, turned her over, grabbed one foot, and ordered Dixon to hold the other. The two men dragged her back to the video store office where Murphy ordered Dixon to get the cash register. Dixon then left the office. When Murphy demanded that Ruffing open the safe, she told him there was no money it. Murphy began to hit her with his fists, knocking her down repeatedly. Ruffing was wearing a ring and Murphy commented that "Tracy" would like it. Ruffing removed the ring, threw it down and ran out of the office into the middle of the store. There she observed a woman standing outside, near the door. But when Ruffing screamed for help, the woman turned away. Ruffing later identified the woman as Tracy Chaffins.

**{¶25}** Before she could escape, she was dragged back to the office. Murphy then raped her inside the office. After the rape Murphy hit her in the head with a hammer and knocked her unconscious.

### 3. Murphy's and Dixon's Defenses

**{¶26}** Dixon took the stand and testified that Murphy asked him for a ride to Franklin Furnace. He gave Murphy a ride and Murphy later told him they were going to B+G. He claimed he did not know that Murphy intended to rob the store.

**{¶27}** While at B+G Dixon played lottery tickets. He would walk outside to his car to play them, and then reenter the store to purchase more lottery tickets. He denied

any involvement in the actual robbery or assault.   He also denied being in the store when the robbery took place, but stated that he must have been sitting in his car when it happened.  Dixon admitted seeing blood on Murphy, from his neck, on the front of his white shirt, and down to his pants and a bloody hammer in his waistband.

{¶28}  Dixon also admitted taking some hammers from Murphy's mother's house and hiding them outside the residence because he was "paranoid" that Murphy would use them again.  On cross-examination, Dixon could not recall making many of the statements that appeared in the redacted summary.

{¶29}  Murphy did not take the stand.  For his defense he called James, Terry, and Samantha Chaffins, the father, mother, and sister-in-law, respectively, of Tracy Chaffins.[1]  Their testimony was that Tracy and Wayne arrived at James' and Terry's residence the night before the B+G robbery and spent the night.  James stated that the family had a police scanner in the bedroom and the family was drinking coffee together on the morning of the B+G robbery.  The group heard a report come on the scanner about James' sister-in-law, who happened to be the employee who fell ill at B+G.

{¶30}  At some point, Dixon arrived in his car and wanted Murphy to leave with him.  Because Tracy did not want Murphy to leave, they remained with the family.  Later, all three testified that they heard another report on the police scanner that a man was beaten at B+G and required assistance.  This assertion was challenged by the prosecutor, who asked them why a report would come on when earlier testimony suggested an unknown individual reported the assault directly at the fire station.

---

[1] The record reflects that Tracey Chaffins committed suicide sometime after the B+G and Kentucky robberies.  Apparently she was indicted for her participation in the Kentucky robbery but was never tried.

**{¶31}** Except for a brief moment in James Chaffins' testimony, all three witnesses remained consistent in their testimony that Murphy and Tracy did not go to Franklin Furnace. At one point James Chaffin stated that "Wayne, her, and Ryan left." But the remainder of his testimony was consistent with the other two alibi witnesses.

**{¶32}** The jury ultimately found Murphy and Dixon guilty of aggravated robbery, felonious assault, and attempted murder. Murphy received a sentence of ten years for aggravated robbery, eight years for felonious assault, and ten years for attempted murder. After the court ordered the sentences to be served consecutively, for a total sentence of twenty-eight years, Murphy filed this appeal.

## II. Assignments of Error

**{¶33}** Murphy presents six assignments of error:

**{¶34}** I. THE TRIAL COURT ERRED WHEN IT ORDERED THAT THE DEFNEDANT [SIC] REMAIN IN SHACKLES DURING THE JURY TRIAL.

**{¶35}** II. THE TRIAL COURT ERRED BY PERMITTING A SUMMARY OF A STATEMENT OF A CO-DEFENDANT TO BE USED AGAINST THE DEFENDANT WHILE RESTRICTING CROSS EXAMINATION OF A STATE'S WITNESS.

**{¶36}** III. THE TRIAL COURT ERRED BY PERMITTING EVIDENCE OF THE DEFENDANT'S PRIOR CONVICTIONS TO BE ADMITTED AGAINST THE DEFENDANT WHEN SUCH CONVICTIONS WERE UNRELATED TO THE CURRENT CHARGES.

**{¶37}** IV. THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR SEPARATE TRIALS.

**{¶38}**  V.  THE TRIAL COURT ERRED BY DENYING THE DEFENDANT'S MOTION FOR A MISTRIAL.

**{¶39}**  VI. THE TRIAL COURT ERRED BY SENTENCING THE DEFENDANT CONSECUTIVELY FOR ALLIED OFFENSES OF SIMILAR IMPORT.

### III.  Restraints

**{¶40}**  In his first assignment of error, Murphy argues that the trial court violated his due process rights when it ordered him to be placed in restraints during his trial. However, Murphy failed to object to the use of restraints.  At the security hearing, the prosecutor argued that both defendants should be shackled.  Dixon's attorney offered an argument contra but Murphy's attorney stated "we don't wish to be heard at this time on this issue, your Honor."  We were unable to locate on the record any further objections to restraints by Murphy.  Consequently, Murphy must demonstrate plain error or he has waived this issue.

**{¶41}**  "Plain error" exists only when it is clear the verdict would have been otherwise but for the error. *State v. Sanders,* 92 Ohio St.3d 245, 263, 2001-Ohio-189, 750 N.E.2d 90. Plain error review places three limitations on a reviewing court's decision to correct an error not objected to during trial. First, there must be legal error. Second, the error must be "plain." Within the meaning of Crim.R. 52(B), an error is "plain" if there is an "obvious" defect in the trial proceedings. Third, the error has to affect "substantial rights." *State v. Barnes,* 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. The Supreme Court of Ohio has "interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." Id.  The Court further explained "[e]ven if a forfeited error satisfies these three prongs, however,

Crim.R. 52(B) does not demand that an appellate court correct it. Crim.R. 52(B) states only that a reviewing court 'may' notice plain forfeited errors; a court is not obliged to correct them. We have acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" Id., quoting *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804.

**{¶42}** Murphy contends that the trial court erred by ordering him to wear restraints at trial because there was no evidence that he posed any risk of violence or escape. Additionally, because he remained seated when in the jury's view and the jury only actually saw Dixon in restraints, Murphy argues that the court contributed to its own error by announcing to the jury that he and Dixon were shackled.

**{¶43}** We begin with the general rule that restraints tend to erode the presumption of innocence that cloaks a defendant at his trial. *State v. Hairston*, Scioto App. No. 06CA3089, 2007-Ohio-3707, at ¶28. Although the defendant generally should be allowed to appear at his trial "unfettered," see *State v. Carter* (1977), 53 Ohio App.2d 125, 131-132, 372 N.E.2d 622, this is not an absolute right. It is "widely accepted that a prisoner may be shackled where there is danger of violence or escape." *State v. Fields*, Scioto App. No. 06CA3080, 2007-Ohio-4191, at ¶26, quoting *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶79. Ultimately, the decision to require a defendant to wear restraints rests in a trial court's sound discretion. *Hairston* at ¶30.

**{¶44}** For effective appellate review of the court's discretion, the trial court should hold a hearing on the need for restraints or otherwise enter on the record the factors relied upon in its decision to restrain the defendant. *Carter* at 132. Even without

a hearing, an appellate court will not disturb the trial court's exercise of its discretion to impose restraints if the record demonstrates "a compelling need to impose exceptional security procedures." *Franklin* at ¶82.

**{¶45}** In exercising its discretion the trial court should not merely defer to the recommendation of security personnel. *State v. Curry* (Sept. 30, 1997), Scioto App. No. 95CA2339, 1997 WL 600056, at *11, citing *Carter* at 131. The court must balance the rights of the defendant with the "competing interests of other courtroom participants and society in general," while keeping in mind that restraints are an extreme measure. *Carter* at 132, quoting *United States v. Theriault* (C.A. 5, 1976), 531 F.2d 281, 284.

**{¶46}** Certain factors tend to mitigate the prejudice that is presumed to arise when a defendant is restrained at trial. First, prejudice may be lessened if a court takes measures to ensure that jurors are unaware of a defendant's shackles. The court might employ "modesty" panels that hide the defendant's legs or arms from view and seat the defendant before the jurors enter the courtroom. *Hairston* at ¶¶27-28. And if the jury becomes aware that a defendant is restrained, a court may also reduce prejudice by cautioning the jurors that they cannot consider the restraints as an indication of guilt for the crime being tried. *Fields* at ¶34.

**{¶47}** The trial court held the security hearing at the conclusion of the pre-trial hearing on defense motions. Earlier in the hearing the court ruled in favor of the State on admitting evidence of "other acts," i.e., the robbery and rape in Kentucky. At this hearing the court heard detailed testimony about the robbery and rape committed by the co-defendants in Kentucky. The court concluded that Murphy and Dixon should remain in shackles in light of the fact the jurors would know that the men were incarcerated in

Kentucky and because of "the nature of this crime and the nature of the crimes they've already been convicted of."

**{¶48}** The trial court may have felt the sadistic and violent nature of Murphy's actions in Kentucky required precautions in order to assure the safety of jurors, attorneys, staff, and others in attendance. This is understandable and we recognize that a trial court need not wait for a defendant to act out before employing restraints. *Franklin* at ¶79, citing *Loux v. United States* (C.A.9, 1968), 389 F.2d 911, 919-920. But the fact that Murphy was convicted of violent crimes and serving a life sentence in Kentucky, alone, was not sufficient to merit shackling. See *Carter* at fn. 2. In light of other security measures available, the evidence relied upon by the court here does not demonstrate the "unusual circumstances" or "compelling need" typically associated with restraining a defendant during his own trial. See *State v. Kidder* (1987), 32 Ohio St.3d 279, 285, 513 N.E.2d 311; *State v. Evans,* Scioto App. No. 05CA3002, 2006-Ohio-2564, at ¶39. The State presented no evidence indicating that Murphy had acted out violently in a courtroom in the past, had made any threats to act violently at the trial, or had otherwise alarmed court security personnel. Accordingly, we hold that it was error to order Murphy restrained at trial. But for the following reasons the error here does not rise to the level of "plain error."

**{¶49}** The record indicates that the trial court took steps to lessen any prejudice stemming from placing Murphy in restraints. Murphy remained seated throughout the trial and his legs and arms were shielded from the jurors' view with the use of "modesty panels." Murphy admits that no juror observed him in restraints.

{¶50} But when Dixon took the stand, the attorneys and court realized that the jurors would see Dixon's handcuffs if he held the witness microphone. The court and attorneys considered excusing the jury, apparently so that Dixon could position the microphone so that the jurors would not see his restraints. But the court remarked that the jurors would still be able to look over from the jury box and see Dixon's restraints. Then the following discussion took place:

THE COURT: I think we ought to just give a cautionary instruction.

[DIXON'S ATTORNEY]: I think a cautionary instruction in this case would be fine.

THE COURT: They already know that they're incarcerated in Kentucky.

[DIXON'S ATTORNEY]: Yeah.

[MURPHY'S ATTORNEY]: Yeah.

PROSECUTOR: Yeah.

{¶51} The trial court then admonished the jury:

{¶52} "All right. Ladies and Gentlemen of the jury, because of the nature of the charges and because you know, they've been convicted in Kentucky and they're serving a prison term I ordered that they be handcuffed and shackled. And I don't like the jurors to see a person like that because in no way do I want you to hold that against him, the fact that I as a judge made a determination for your safety, everybody's safety in the courtroom, as well as the Defendant's safety that he would be handcuffed and shackled and remain that way during the trial. Now, the fact that he is handcuffed and shackled, you cannot use that for any reason whatsoever to connect that with this case. Okay? He's serving a prison term in Kentucky. All right?"

{¶53} Thus, Murphy's attorney approved the court's decision to give a cautionary instruction to the jury, alerting them that he was shackled. We approved a similar cautionary instruction in *Fields* at ¶34. Moreover, if a jury is already aware that the defendant is an inmate serving time on a different crime any prejudice that results from viewing him in shackles is reduced. See *State v. Garrett*, Richland App. No. 03-CA-49, 2004-Ohio-2231, at ¶41. Finally, the State presented considerable evidence implicating Murphy in the B+G robbery. Given that our standard of review is plain error, we are unable to say that "but for" the jury's awareness of Murphy's restraints he would have been acquitted or that a manifest miscarriage of justice occurred.

## IV. Consolidated Trials

{¶54} In his fourth assignment of error, Murphy argues that the court erred by denying his motion for separate trials. In his second assignment of error, Murphy contends that the court erred by permitting Detective Conkel to read a redacted summary of Dixon's statement which implicated Murphy in the crime. Murphy also argues the use of a redacted summary limited his ability to cross-examine Detective Conkel about Dixon's confession. Finally, in a portion of his fifth assignment of error, Murphy argues that Dixon's attorney improperly commented on his Fifth Amendment right to remain silent. Together, these arguments present issues concerning whether Murphy received a fair consolidated trial and we address them together.

### A. Standard of Review

{¶55} We review the trial court's denial of a motion seeking separate trials of co-defendants under the abuse of discretion standard. *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 421 N.E.2d 1288. An abuse of discretion involves more than an error of

judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24; *Wilmington Steel Products, Inc. v. Cleveland Elec. Illuminating Co.* (1991), 60 Ohio St.3d 120, 122, 573 N.E.2d 622. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181, citing *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301.

**{¶56}** Crim.R. 13 provides that a court "may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information." Crim.R. 13 embodies the belief that joint trials "play a vital role in the criminal justice system" by conserving judicial resources, by promoting efficiency, and by serving "the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson v. Marsh* (1987), 481 U.S. 200, 209-210, 107 S.Ct. 1702. Accordingly, Ohio courts favor the joinder of defendants. *Torres* at 343; *State v. Thomas* (1980), 61 Ohio St.2d 223, 225, 400 N.E.2d 401.

**{¶57}** But the Rules of Criminal Procedure also recognize that a joint trial has the potential for prejudice to a defendant (or the State). Crim.R. 14 allows a court to order separate trials "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." However, "[a] defendant claiming error in the trial

court's refusal to allow separate trials of multiple charges" also "has the burden of affirmatively showing that his rights were prejudiced." *Torres* at 343.

### B.  Inconsistent Defenses

**{¶58}**  Murphy first contends that he was prejudiced because his defense and that of Dixon were mutually antagonistic and irreconcilable.  Various courts have described defenses as antagonistic "where each defendant is trying to exculpate himself and inculpate his co-defendant."  *State v. Daniels* (1993), 92 Ohio App.3d 473, 486, 636 N.E.2d 336, citing *Romano v. State* (Okla.Crim.App.1992), 827 P.2d 1335; see, also, *State v. Kleekamp*, Montgomery App. No. 23533, 2010-Ohio-1906, at ¶103; *State v. Walters*, Franklin App. No. 06AP-693, 2007-Ohio-5554, at ¶23; *State v. Love*, Mahoning App. No. 02CA245, 2006-Ohio-1762, at ¶15.  Antagonistic defenses between co-defendants can be so prejudicial that they can deny a co-defendant a fair trial.  *Daniels* at 486.  In order to warrant severance, the defenses must be both irreconcilable and mutually exclusive.  *State v. Bunch,* Mahoning App. No. 02CA196, 2005-Ohio-3309, at ¶43 (reversed in part on other grounds by *In re Ohio Criminal Sentencing Statute Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174, at ¶92), citing *United States v. Berkowitz* (C.A.5, 1981), 662 F.2d 1127, 1133.  "The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other."  Id.

**{¶59}**  In his pre-trial motion for separate trials, Murphy informed the court that he intended to present an alibi defense and that he intended to produce other evidence that Dixon may have committed the criminal acts.  Murphy also asserted that he learned through pre-trial conferences that Dixon intended to blame Murphy for the robbery.  The

State responded that severance was unwarranted and cited *Walters*, supra, for the proposition that shifting the blame to another co-defendant and exculpating oneself do not mandate separate trials.

**{¶60}** However, *Walters* is clearly distinguishable from the present case. There the court of appeals held that one co-defendant's "defense of another" defense theory was not mutually antagonistic to the other co-defendant's "no causation defense." *Walters* at ¶36. That case involved a fight between the deceased victim and the two co-defendants. At trial, one co-defendant's defense was that he justifiably attacked the victim because he was defending the other co-defendant, i.e., defense of another. The other co-defendant claimed that whatever physical contact he had with the victim could not have caused the victims death, i.e., a "no-causation defense." The court explained that "defense of another" is a variation of self-defense. Self-defense "does not merely deny or contradict the evidence offered by the State, but rather admits the prohibited conduct while claiming that surrounding facts or circumstances justify the conduct." Id., quoting *State v. Brown*, Mahoning App. No. 03MA231, 2005-Ohio-4502, at ¶14. Thus, jurors could believe one co-defendant was justified in attacking the victim under a "defense of another theory" while simultaneously believing that the other co-defendant's physical contact did not ultimately cause the death of the victim.

**{¶61}** In this case, Murphy supplied the court with sufficient information about mutually antagonistic defenses that should have led the court to consider whether prejudice would occur. If Murphy put forth evidence inculpating Dixon but also claimed he was not present at the crime scene, i.e., put forth an alibi defense, and Dixon were to

argue that it was Murphy acting alone who committed the crime, the jury is undoubtedly faced with the situation where one or both co-defendants is lying.

**{¶62}** However, merely because co-defendants may assert incongruous defenses does not mean that a consolidated trial will compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence. See *Zafiro v. United States* (1993), 506 U.S. 534, 113 S.Ct. 933; *Walters* at ¶¶24-25. Murphy had the burden of clearly demonstrating that he would be prejudiced or deprived of a specific trial right. The pre-trial motion, although providing the court with sufficient information to consider possible prejudice, did not clearly demonstrate a serious risk of loss of a specific trial right. And in its memorandum contra, the State indicated it intended to present evidence against both defendants.

**{¶63}** After considering what ultimately occurred at the trial, we are convinced that a consolidated trial did not prejudice Murphy's rights. Ultimately, Murphy presented an alibi defense but did not actively attempt to inculpate Dixon in the crime. His witnesses alleged that Dixon wanted him to go to Franklin Furnace but that he declined, staying with them. None of Murphy's witnesses testified that Dixon committed any crimes. Thus, although the two defenses were inconsistent, they were not mutually antagonistic.

**{¶64}** Furthermore, the State presented substantial incriminating evidence against both defendants. In other words, the State was not a passive participant, sitting by idly while Dixon or Murphy pointed the finger at one another and allowing the jury to conclude that one or both was lying. At least two witnesses positively identified Murphy in B+G prior to the incident. Waddell testified that Dixon was in the store and Murphy

could not have left the store without him noticing.  And the significant number of

similarities between the Kentucky robbery and the B+G robbery led jurors to reasonably

conclude that both men were involved.  Accordingly, this argument is meritless.

C.  Limitation on Cross-Examination of Co-Defendant Statement

{¶65}  Murphy also asserts that the failure to sever his trial from Dixon's

prejudiced him because he was limited on cross-examination of a redacted summary of

a statement Dixon made to Detective Conkel.  The summary Conkel read at trial stated:

> William stated to me that he had been using cocaine for about a month before this event on July 5th, 2004.  He went in his red Honda to the home of Tracey Chaffins' parents.  He then went to the Furnace *** and headed towards Blanton and Graph [sic].[2]  He knew that Jade went to the hospital and that Waddell would be at the store by himself.  He was going to the store to rob it to get drug money.
>
> He left Tracey Chaffins' parents['] house, stopped along the road and smoked a joint.  He pulled the car to the left side of Blanton and Graphs Grocery and waited for someone.  He went in and played lottery tickets for about one hour.  Art waited on him.  He had been in the grocery many times and knew Art by sight.  He went out and played the lottery tickets in his car and got a little higher on cocaine.  He went back in and cashed the lottery tickets in.  It was definitely around noon.  He knew there was going to be a robbery.
>
> The cash register was taken from the grocery.  He stated that there were hammers in the car.  Afterwards he went and got some beer and drugs.  He said there was $1,400.00 taken from the store.  He knew that a robbery was going to take place and he would get something out of it.  He said he didn't think anyone would get hurt.  Afterward he said he drove back to Tracey's parents' house.
>
> William stated that he drove his car and that he was present during the robbery of Blanton and Graph Grocery.  He stated that his car was used in both robberies; Blanton and Graphs Grocery and the video store in Russell, Kentucky.

{¶66}  Murphy concedes that he did not face a *Bruton*/Confrontation Clause

issue when Conkel read this summary into the record because Dixon later took the

---

[2] The star ellipsis denote a portion of Conkel's testimony not from the redacted summary.  She explained what was meant by "the Furnace," i.e., Franklin Furnace.

stand and provided him with an opportunity to cross-examine on the statement. See *Bruton v. United States* (1968), 391 U.S. 123, 132, 88 S.Ct. 1620. However, Murphy argues that the redacted summary implicated him and he was unable to cross-examine Detective Conkel regarding the full statement and was restricted in his cross-examination concerning the redacted summary.

{¶67} Our review of the record reveals that Murphy's counsel began his cross-examination of Detective Conkel by asking her if she felt the redacted summary was an accurate reflection of the full statement made by Dixon. Conkel said it was not. The prosecutor then asked for a bench conference where the prosecutor informed the Court that if Murphy's attorney continued on this line of questioning, it would open the door to questions concerning Murphy's participation in the crime. In other words, on re-direct the State would say "Detective Conkel, why is this not an accurate representation of the statement Dixon gave?" to which she would explain that it was redacted to omit references to Murphy. Thus, the reason that Murphy was restricted in his cross-examination of the statement was to prevent him from opening the door to a line of questions from the State that would have clearly implicated Murphy in the statement.

{¶68} But Murphy also proposes that the "vague" references to "he" throughout the statement caused the jurors great suspicion as to who "he" was. We do not share a similar impression when reviewing the statement. The statement begins with "William [Dixon] told me" and then refers to a "he" through the remainder of the statement. The statement makes sense if one were to replace "he" with "Dixon" throughout. Given the evidence in the case, none of the instances of "he" would require jurors to assume that

"he" was actually referring to Murphy. Accordingly, we do not view the redacted summary as unfairly implicating Murphy. This argument is meritless.

### D. Improper Comment by Co-Defendant Counsel

{¶69} Finally, Murphy argues that he was prejudiced when Dixon's attorney commented on his Fifth Amendment right of remaining silent and electing not to take the witness stand. During closing arguments, Dixon's counsel said: "Now you've heard Mr. Dixon. He actually came on the stand. He testified." At the onset we note there was no objection to this allegedly prejudicial remark. Accordingly, our review is limited to a plain error analysis. See discussion of plain error analysis, supra, Section III. Assuming we were to agree that the comment was improper, we cannot say that "but for" Dixon's attorney's comment, the outcome of the trial would have been different. This was a brief remark in a trial in which the State presented substantial incriminating evidence against Murphy. Thus, there is no plain error. These assignments of error are meritless.

### V. Evidence of the Kentucky Robbery

{¶70} Murphy argues in his third assignment of error that the trial court erred by admitting evidence of the rape that occurred during the Kentucky robbery. Murphy concedes that some elements between the B+G robbery and the Kentucky robbery were similar and were admissible to prove identity. But Murphy argues that evidence of the rape was inflammatory and prejudicial. The State does not directly respond to Murphy's argument that evidence of the rape was inflammatory, but rather concentrates on the admissibility of the Kentucky robbery under Evid.R. 404(B) to prove Murphy's identity as the perpetrator of the B+G robbery.

**{¶71}** The admission of evidence is within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, at paragraph two of the syllabus. See discussion of abuse of discretion standard, supra, Section IV.A.

**{¶72}** Evidence of other acts is not admissible for the purpose of proving the accused acted in conformity with that character on a particular occasion. *State v. Treesh*, 90 Ohio St.3d 460, 482, 2001-Ohio-4, 739 N.E.2d 749. Evid.R. 404. However, Evid.R. 404(B) provides other acts evidence may be admissible when it is offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**{¶73}** Additionally, R.C. 2945.59 provides that:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

**{¶74}** R.C. 2945.59 is to be strictly construed against the State, and to be conservatively applied by a trial court. *State v. DeMarco* (1987), 31 Ohio St.3d 191, 194, 509 N.E.2d 1256.

**{¶75}** Thus, evidence of other acts may be admissible if the evidence is offered for a purpose other than to show the accused's propensity to act in conformity with the accused's character, e.g., to commit a certain type of crime. *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, at the syllabus. For prior acts evidence to be admissible, the evidence must be relevant to proving the guilt of the offense in question. *State v. Gardner* (1979), 59 Ohio St.2d 14, 20, 391 N.E.2d 337. See, also, *State v.*

*Henderson* (1991), 76 Ohio App.3d 290, 294, 601 N.E.2d 596. There must be substantial evidence that the accused committed the act. See *State v. Carter* (1971), 26 Ohio St.2d 79, 269 N.E.2d 115, at paragraph two of the syllabus.  In addition, the prior act must not be too remote and must be closely related in time and nature to the offense charged. *State v. Burson* (1974), 38 Ohio St.2d 157, 159, 311 N.E.2d 526. If the act is too distant in time or too removed in method or type, it has no permissible value. *Henderson* at 294.

**{¶76}** Both Murphy and the State agree that the many similarities between the Kentucky robbery and the B+G robbery were admissible for the purpose of demonstrating identity.  Among other similarities, evidence was introduced that (1) two men were involved in both robberies; (2) one person "cased" the place of business prior to the robbery; (3) a hammer or hammers were used to assault the victim; (4) the victim was attacked from behind; (5) the robberies took place at or around the noon hour; (6) the perpetrators dragged the victim from the initial point of attack to another part of the store where the money was located, which left a trail of blood; (7) a personal item was taken from the victim in both robberies; and (8) Tracy Chaffins was seen at both robberies.

**{¶77}** Thus, due to the numerous similarities between the crimes and Waddell's inability to say who attacked him, this evidence was relevant to establishing a relevant and material issue in the B+G robberies: identification of the perpetrators. Cf. *State v. Curry* (1975), 43 Ohio St.2d 66, 73, 330 N.E.2d 720.  This evidence was ultimately instrumental in the State's effort to prove Murphy's guilt because Waddell was unable to identify Murphy as his attacker, although he had seen him in the store previously.  The

striking similarities between the B+G robbery and the Kentucky robbery were properly introduced to resolve any doubt the jury had about Murphy's participation in the crime.

**{¶78}** But Murphy contends that the State should not have been allowed to introduce evidence that he raped Ruffing in the course of the Kentucky robbery because it bared no similarity to the B+G robbery and was prejudicial. As with all evidence, other acts evidence is subject to the relevancy and fairness requirements of Evid.R. 403(A) and must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Soke* (1995), 105 Ohio App.3d 226, 249, 663 N.E.2d 986; *State v. Matthews* (1984), 14 Ohio App.3d 440, 442, 471 N.E.2d 849.

**{¶79}** The State was allowed to ask Ruffing if she was raped, a fact that she confirmed. We agree with Murphy that evidence concerning the rape was not probative of his identity under Evid.R. 404(B). No sexual assault was alleged to have occurred in the B+G robbery and thus the evidence did not prove identity. We further agree that admission of the rape was inadmissible under Evid.R. 403(A) because its probative value was substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court erred by admitting it. Nonetheless, we perceive this error as harmless.

**{¶80}** We apply non-constitutional harmless-error analysis to evidentiary errors such as this. *State v. Elliott* (Feb. 27, 1995), Highland App. No. 94CA836, 1995 WL 89732, at *3 (applying non-constitutional harmless-error analysis to admission of irrelevant evidence). See, also, *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, at ¶88 (applying non-constitutional harmless-error analysis to erroneous admission of other acts evidence); *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶74 (same). A non-constitutional error is harmless

when there is substantial other evidence to support the guilty verdict. *State v. Webb*, 70 Ohio St.3d 325, 335, 1994-Ohio-425, 638 N.E.2d 1023. For the following reasons, we conclude that the erroneous admission of Ruffing's testimony concerning the rape was harmless.

**{¶81}** First, as previously noted, the State presented a substantial amount of admissible evidence of Murphy's guilt. Second, Ruffing described the details of the vicious assault perpetrated on her by Murphy and Dixon. Jurors were also shown bloody photographs of crimes scene at both the B+G robbery and the Kentucky robbery. Thus, jurors were already exposed to evidence of other repulsive conduct. Given the sadistic nature of the crimes for which he was being tried, we seriously doubt that evidence of the rape added much in terms of "aggravating" the jurors. Third, at the close of evidence the court properly instructed jurors that they could consider evidence about other crimes only for a limited purpose and not to prove the character of the defendants. "A presumption always exists that the jury has followed the instructions given to it by the trial court." *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, at paragraph four of the syllabus. Thus, we conclude that the error here was harmless and overrule this assignment of error.

## V. Grounds for Mistrial

**{¶82}** In his fifth assignment of error, Murphy contends that the trial court erred in overruling his motion for a mistrial. Murphy asked for a mistrial after the prosecutor swung a hammer towards the jury and within two feet of them, apparently to demonstrate the manner in which blood splatters patterns are created.

{¶83} The grant or denial of a motion for mistrial rests within the sound discretion of the trial court. *Sage* at 182. Under Crim.R. 33(A)(2) a trial court may grant a mistrial for "misconduct" of a prosecuting attorney. However, the trial court should not order a mistrial merely because of some intervening error or irregularity unless the substantial rights of the accused are adversely affected. *State v. Nichols* (1993), 85 Ohio App.3d 65, 69, 619 N.E.2d 80. This determination is also within the sound discretion of the trial court. Id.

{¶84} Prosecutors are afforded a certain degree of latitude in their closing arguments. *State v. Keenan* (1993), 66 Ohio St.3d 402, 409, 613 N.E.2d 203. To determine whether comments made by a prosecutor during closing argument amount to misconduct warranting a mistrial, a court must examine "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. In order for a defendant to successfully move for a new trial based upon prosecutorial misconduct, the defendant must show that the prosecutor's conduct deprived the defendant of a fair trial. *Keenan* at 405; *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 473 N.E.2d 768. It must be clear beyond a reasonable doubt that, absent the prosecutor's conduct, the jury would not have found the defendant guilty. *Smith* at 15.

{¶85} We view nothing improper in the prosecutor briefly swinging a hammer to demonstrate blood splatter pattern during rebuttal. Detective Conkel described blood splatter to the jury earlier when reviewing photographs of the crime scene. The prosecutor's purpose, apparently, was to demonstrate how blood splatter observed in certain crime scene photographs was created. This was fair comment on the evidence

presented on trial.  The trial court did not abuse its discretion in failing to grant a mistrial.

Accordingly, this assignment of error is meritless.

## VII. Allied Offenses

{¶86}  In his sixth assignment of error Murphy contends that the trial court erred

by sentencing him consecutively for allied offenses of similar import.  Specifically,

Murphy contends that his conviction for attempted murder, a violation of R.C.

2923.02(A) and R.C. 2903.02(A), and felonious assault, a violation of R.C.

2903.11(A)(2)/(D)(1) are allied offenses of similar import and were committed with the

same animus.  Therefore, Murphy argues that he should only have been sentenced for

either attempted murder or felonious assault, but not both.

{¶87}  Ohio's multiple-count statute, R.C. 2941.25, provides:

(A)  Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B)  Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶88}  A two-step analysis is required to determine whether two crimes are allied

offenses of similar import. See, e.g., *State v. Blankenship* (1988), 38 Ohio St.3d 116,

117, 526 N.E.2d 816; Recently, in *State v. Cabrales,* 118 Ohio St.3d 54, 2008-Ohio-

1625, 886 N.E.2d 181, the Court stated: "In determining whether offenses are allied

offenses of similar import under R.C. 2941.25(A), courts are required to compare the

elements of offenses in the abstract without considering the evidence in the case, but

are not required to find an exact alignment of the elements. Instead, if, in comparing the elements of the offenses in the abstract, the offenses are so similar that the commission of one offense will necessarily result in commission of the other, then the offenses are allied offenses of similar import." Id. at paragraph one of the syllabus. If the offenses are allied, the court proceeds to the second step and considers whether the offenses were committed separately or with a separate animus. Id. at ¶31.

{¶89} Although the first step in the *Cabrales* analysis requires us to compare the elements of attempted murder with felonious assault in the abstract, both Murphy and the State direct us to a recent Supreme Court case on point. In *State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, the Court held that felonious assault as defined in R.C. 2903.11(A)(2) is an allied offense of attempted murder as defined in R.C. 2903.02(A) and 2923.02. In the absence of a separate animus for each crime, a criminal defendant "may be found guilty of both offenses, [but] he may be sentenced for only one." Id. at ¶27. In light of the holding in *Williams,* we need not independently determine whether the elements align to such an extent as to result in the offenses being allied offenses. However, we must still determine if the offenses were committed with a separate animus.

{¶90} The Supreme Court explained the meaning of the word "animus" in *State v. Logan* (1979), 60 Ohio St.2d 126, 397 N.E.2d 1345. "R.C. 2941.25(B), by its use of the term 'animus', requires us to examine the defendant's mental state in determining whether two or more offenses may be chiseled from the same criminal conduct. In this sense, we believe that the General Assembly intended the term 'animus' to mean

purpose or, more properly, immediate motive." Id. at 131.  In more detail, the Court

explained:

> Where an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, A priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime. For example, when a person commits the crime of robbery, he must, by the very nature of the crime, restrain the victim for a sufficient amount of time to complete the robbery. Under our statutes, he simultaneously commits the offense of kidnapping (R.C. 2905.01(A)(2) [sic] by forcibly restraining the victim to facilitate the commission of a felony. In that instance, without more, there exists a single animus, and R.C. 2941.25 prohibits convictions for both offenses. Likewise, where an individual's immediate motive is to engage in sexual intercourse, and a so-called "standstill" rape is committed, the perpetrator may be convicted of either rape or kidnapping, but not both. In contradistinction, an individual who restrains his intended rape victim for several days prior to perpetrating the rape, or who transports her out of the state or across the state while intermittently raping her, may well be considered to have a separate animus as to each of the offenses of kidnapping and rape, and convictions on multiple counts could reasonably be sustained.

Id. at 131-132.

{¶91}  Murphy contends that Waddell could not remember anything after the

initial blow and although he testified that he received five blows to the head and twelve

blows to his body, he could not specify when those blows were dealt to him.  Thus,

Murphy contends that we must consider the entire assault as one ongoing event with a

single motive, i.e., to cause serious injury or death to Waddell as a precursor to

committing robbery at B+G.

{¶92}  The State argues that the evidence at trial indicated that Waddell was

struck from behind with a hammer as he was walking up an aisle towards Dixon.  The

State further alleges that photographs demonstrate that the initial blow knocked him to

the ground, but he was able to get up and may have grabbed a grocery cart near the

point of impact.  The State suggests that the evidence further indicates that Waddell

fought with his attackers and received defensive bruises to his hands and arms. The State argues that the initial blow, knocking Waddell out, was sufficient for purposes of providing an animus, or motive, for felonious assault. But the additional blows that came afterward provide a separate motive for attempted murder.

{¶93} Recently, the Eighth District Court of Appeals addressed a similar situation in *State v. Carter*, Cuyahoga App. No. 90504, 2009-Ohio-5961. The court first noted that "[t]he fact that there were several wounds does not automatically mean that a separate animus attaches to each injury." Id. at ¶9. The court further explained:

> In determining whether a separate animus exists, courts have examined case-specific factors such as whether the defendant at some point broke "a temporal continuum started by his initial act" [citing *State v. Williams,* Cuyahoga App. No. 89726, 2008-Ohio-5286]; whether, at some point, the defendant created a "substantial independent risk of harm" [ id.]; whether facts appear in the record that "distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed" [citing *State v. Hines,* Cuyahoga App. No. 90125, 2008-Ohio-4236]; and whether a "significant amount of time passed between the beginning of the felonious assault and the end of the attack [citing *State v. Chaney,* Stark App. No. 2007CA00332, 2008-Ohio-5559].

Id.

{¶94} We find *Carter* instructive. In this case the evidence at best demonstrates that Waddell was struck with an initial blow sufficient to cause total memory loss of what occurred next. The jury could speculate from the additional blows to Waddell's head and blows to his arms that Waddell may have attempted to fight his attackers or attempted to shield himself from their blows with his arms. Furthermore, the evidence suggested that Waddell may have been dragged from the initial point of attack to a different location in the store.

**{¶95}** But none of this evidence indicates two distinct motives in the assault. That is, that during the course of the robbery, Murphy and Dixon first decided to seriously injure Waddell and then later decided to cause his death, or vice versa. Moreover, no evidence suggests that the attack took place over an extended period of time, which could permit such an assumption. Neither does the evidence reasonably support the conclusion that there was a temporal break in the attack. There is simply no way that reasonable jurors could differentiate one of the approximate seventeen "blows" that Waddell received as a result of the robbery.

**{¶96}** At best, the evidence suggests a violent continuous attack with a single motive: to cause serious injury or death to Waddell in order to allow Dixon and Murphy to commit a robbery. Thus, the trial court erred in failing to merge Murphy's sentence for felonious assault and attempted murder.

## VIII. Conclusion

**{¶97}** Based on the foregoing we overrule Murphy's first, second, third, fourth, and fifth assignments of error. We sustain Murphy's sixth assignment of error concerning the trial court's failure to merge his convictions for felonious assault and attempted murder. Pursuant to the Supreme Court's holding in *State v. Whitfield,* 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, at paragraph one of the syllabus, "[t]he state retains the right to elect which allied offense to pursue on sentencing on a remand to the trial court after appeal."

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART, AND
CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED. Appellant and Appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

McFarland, P.J. & Kline, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
William H. Harsha, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**