[Cite as *State v. Minton*, 2016-Ohio-5427.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 15CA1006 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| KELLY MINTON, | : | |
| Defendant-Appellant. | : | RELEASED 08/16/2016 |

APPEARANCES:

Michael K. Allen, Michael K. Allen & Associates, Cincinnati, Ohio, for defendant-appellant.

David Kelley, Adams County Prosecuting Attorney, and Mark R. Weaver, Adams County Assistant Prosecuting Attorney, West Union, Ohio, for plaintiff-appellee.

Hoover, J.

{¶1} Kelly Minton ("Minton") appeals from the judgment entry on sentence entered on April 29, 2015, in the Adams County Common Pleas Court. After a five-day jury trial, Minton was convicted of one count of rape with a specification in violation of R.C. 2907.02(A)(1)(b), and two counts of rape in violation of R.C. 2907.02(A)(2). On appeal, Minton contends that the trial court erred in excluding certain proffered witness testimony and certain cross-examination of the victim under Ohio's rape shield law. Minton also contends that the trial court erred in making other evidentiary rulings; that the prosecutor engaged in misconduct; that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence; and that the trial judge was biased towards the victim and should have disqualified himself from presiding over the case. Upon review, we find no merit in any of Minton's assignments of error. Accordingly, we affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶2}    On June 23, 2014, Minton was indicted on four counts of rape: Count 1 – rape in violation of R.C. 2907.02(A)(1)(b), with life specification, a felony of the first degree; Count 2 – rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; Count 3 – rape in violation of R.C. 2907.02(A)(2), a felony of the first degree; and Count 4 – rape in violation of R.C. 2907.02(A)(2), a felony of the first degree. Various pre-trial hearings were held, and on April 13, 2015, a five-day jury trial commenced. During the trial, after the State had presented its case, the trial court dismissed Count 4 of the indictment upon Minton's Crim.R. 29 motion for acquittal. Minton then presented a case in defense, but was ultimately found guilty of the remaining counts on April 17, 2015. On April 29, 2015, Minton was sentenced to mandatory life in prison on Count 1 and to two consecutive eight-year prison terms on Counts 2 and 3 for a total term of life imprisonment plus 16 years. Minton was also classified as a Tier III sex offender, and ordered to pay fines and costs.

{¶3}    The following facts are adduced from Minton's trial.

{¶4}    The victim and her biological brother were adopted when the victim was five or six years old. On November 15, 2008, the victim gave birth to a son. The victim was only 13 years old when her son was born.[1]

{¶5}    Minton is the biological brother of the victim's adoptive mother – i.e. the victim's adopted uncle. At trial, the victim testified that she had sexual intercourse with Minton on at least four occasions: (1) on or near Thanksgiving 2007[2]; (2) during February 2008 when it was alleged that the victim's son was conceived; (3) during August 2008 while she was six months pregnant;

---

[1] The victim's date of birth is January 11, 1995.
[2] The victim would have been 12 years old on the date of this incident.

and (4) when she was 17 years old. The dates of each of the four incidents coincide with the dates of each of the four counts of the indictment.

{¶6}    Minton lived in a house with his wife, Georgia, in Adams County, Ohio. The victim's grandmother (Minton's mother) lived in a home a "stone's throw away" from Minton; and the victim testified that she spent almost every weekend at her grandmother's house. The sexual encounters that occurred in 2007 and 2008 reportedly occurred in a shed located on Minton's property. The victim referred to the shed as the "cat building" or "cat house" because she used to feed cats that lived in there.

{¶7}    The victim testified that sometime during Thanksgiving week 2007[3], Minton came into the shed while she was feeding the cats, grabbed her arms near her biceps, took off her clothes, and had sex with her on a rug while she was on her back and he was on top of her. The victim testified that immediately after the incident Minton told her: "[I]f I ever told that no one would believe me, that they would believe him." The victim also bled from her vagina immediately after the incident.

{¶8}    Minton, Minton's wife Georgia, and Georgia's father all testified that they traveled to Tennessee during Thanksgiving week 2007; with Minton testifying that they left for Tennessee the day before Thanksgiving.

{¶9}    The victim testified that the second incident of sexual intercourse occurred in the shed in February 2008. Specifically, she testified that Minton came into the shed while she was feeding the cats, picked her up near the waist and put her on a table, moved her skirt and underwear to the side, digitally penetrated her vagina with two fingers, and then had sexual intercourse until he ejaculated. She testified that neither she nor Minton said anything to each

---

[3] While the victim could not recall the exact date of the incident, she testified that it occurred in the afternoon, during the week she had off from school for the Thanksgiving holiday, and prior to Thanksgiving dinner.

other, before, during, or after the sexual intercourse. The State alleged that the victim's son was conceived during this encounter.

{¶10}  Lastly[4], the victim testified that a third sexual encounter occurred in August 2008, while she was six months pregnant.[5] The victim testified that she was lying in a hammock in her two-piece bathing suit when Minton approached and told her to enter the shed to help feed the cats. According to the victim, while in the shed Minton proceeded to pick her up near the waist and put her on a table, untied her bathing suit bottom, and then had sexual intercourse with her. No words were exchanged between Minton and the victim while in the shed. During the defense's case, the victim's mother, Georgia Minton, and Minton all testified that there was never a hammock on the Minton property.

{¶11}  The victim testified that Minton's actions made her feel scared, mad, dirty, and wanting to cry, and that she did not want to be around him. However, the victim's mother testified that the victim would repeatedly ask her if she could visit Minton and his wife when she was staying with her grandmother on the weekend.

{¶12}  During their investigation, law enforcement officers executed a search warrant to obtain Minton's DNA. The DNA sample, along with DNA from the victim and the victim's son, were sent to the Ohio Bureau of Criminal Investigation to complete a forensic examination. Michael Monfredi, a forensic scientist with BCI, analyzed the DNA standards and determined and testified that "the probability that Kelly Minton is the biological father of [the victim's son] is 99.9999%".

---

[4] The victim also testified in regards to the fourth alleged incident when she was seventeen years old. However, because the count tied to this incident was dismissed, we choose not to recount this testimony.
[5] The victim did not know she was pregnant at the time of this incident, but learned of her pregnancy shortly thereafter.

{¶13}  Dr. Laura Shower, a licensed obstetrician and gynecologist who cared for the victim during her pregnancy, testified that based on the available data and a "gestation wheel", she calculated the victim's son's conception date to be February 23, 2008, plus or minus 21 days. On cross-examination, Dr. Shower read her notations from the victim's medical records, indicating that the victim told her or her staff that the father of the baby was a 14 year-old boy named Michael Stevenson. The victim's mother also testified that the victim told her Michael Stevenson was the father of her baby; and that she was present when the victim told Dr. Shower that Michael Stevenson was the father of the baby. The victim testified that she told her doctor that the father of the baby was Michael Stevenson because her mother was in the room with her and the doctor.

{¶14}  Minton also testified in his own defense at trial and admitted to having sex with the victim on February 17, 2008. He denied that any other sexual encounters occurred between him and the victim. With regards to the sexual encounter on February 17, 2008, Minton testified that the victim consented to sexual intercourse, that she never resisted him, and that he never used force or threatened her with force.

## II. Assignments of Error

{¶15}  Minton assigns the following errors for our review:

Assignments of Error One - Four[6]:

> The trial court erred and misapplied the "Rape Shield Law" and prevented Mr. Minton the opportunity to present evidence and cross-examine the alleged victim.

Assignment of Error Five:

---

[6] Minton labeled his first assignment of error as "Assignment of Error No. 1-4". Within his "Assignment of Error No. 1-4", Minton identifies four separate but related issues for review.

The trial court erred by admitting a generic school calendar over Mr. Minton's objection.

Assignment of Error Six:

The trial court erred when it denied Mr. Minton's ability to testify on his own behalf by denying that he raped the alleged victim.

Assignment of Error Seven:

The prosecutor committed prosecutorial misconduct in his closing argument.

Assignment of Error Eight:

The trial court erred by denying Mr. Minton's Crim.R. 29 Motion for Acquittals on Counts 1 through 3.

Assignment of Error Nine:

The jury's verdict and Mr. Minton's conviction was against the manifest weight of the evidence.

Assignment of Error Ten:

The trial court erred when it failed to disclose to Mr. Minton that he had information about the alleged victim that could have influenced the judge's rulings and/or failed to disqualify himself from presiding over the trial and rape shield motions.

### III. Law and Analysis

### A. Ohio's Rape Shield Law

{¶16}   In his assignments of error one through four, Minton contends that the trial court erred and violated R.C. 2907.02 and his Sixth Amendment rights when it restricted his ability to cross-examine the victim and to present other witnesses to testify about the victim's past sexual history and alleged history of false accusations of sexual activity.

{¶17}   The jury found Minton guilty of three counts of rape under R.C. 2907.02. Subsection D of that statute contains Ohio's rape shield law, which states:

Evidence of specific instances of the victim's sexual activity, opinion evidence of

the victim's sexual activity, and reputation evidence of the victim's sexual activity

shall not be admitted under this section unless it involves evidence of the origin of

semen, pregnancy, or disease, or the victim's past sexual activity with the

offender, and only to the extent that the court finds that the evidence is material to

a fact at issue in the case and that its inflammatory or prejudicial nature does not

outweigh its probative value. * * *

{¶18}  Under R.C. 2907.02(E):

Prior to taking testimony or receiving evidence of any sexual activity of the

victim or the defendant in a proceeding under this section, the court shall resolve

the admissibility of the proposed evidence in a hearing in chambers, which shall

be held at or before preliminary hearing and not less than three days before trial,

or for good cause shown during the trial.

{¶19}  We review the trial court's rape shield rulings under R.C. 2907.02(D) for an abuse of discretion. *State v. Nguyen*, 4th Dist. Athens No. 12CA14, 2013-Ohio-3170, ¶ 44. "A trial court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable." *State v. Knauff*, 4th Dist. Adams No. 13CA976, 2014-Ohio-308, ¶ 19. However, we use a de novo standard to review alleged violations of a criminal defendant's rights under the Confrontation Clause of the Sixth Amendment. *Nguyen* at ¶ 44, citing *State v. Osman,* 4th Dist. Athens No. 09CA36, 2011–Ohio–4626, ¶ 78.

**1. The Victim's Alleged Sexual History with the Defendant**

{¶20}  First, Minton contends that the trial court violated R.C. 2907.02(D) and his Sixth Amendment rights when it refused to let him present witnesses and to cross-examine the victim about an alleged statement by the victim that Minton had paid her $100 for sex. Minton argues that the statement was permitted under the rape shield law because it relates to the victim's past sexual activity with the defendant. He asserts that the statement implies that the victim admitted to consensual sexual activity with him – a defense to the rape allegations under Counts 2 and 3 of the indictment, which required the State to prove force or threat of force.

{¶21}  Through an *in camera* hearing, Minton proffered testimony from Josh Parks. Parks, a former co-worker of the victim between the years 2012 and 2013, testified *in camera* that the victim told him that Minton paid her $100 per week to have sex. When pressed as to when these relations were supposed to have happened, Parks indicated that he did not know and that the victim did not tell him.

{¶22}  The trial court ruled that the defense could not ask Parks any questions about the victim's alleged comment that Minton was paying her for sex. It also ruled that the defense could not cross-examine the victim at trial or *in camera* on the topic. The trial court reasoned that the suggestion that the victim was accepting money for sexual favors was highly prejudicial especially because the victim was still a minor even at the time that the comments were made, and because Parks could not establish that the comments related to the same time frame of the allegations set forth in the indictment. The trial court also found that the proffered testimony was of little probative value.

{¶23}  Although evidence of past sexual history of the victim is generally excluded under the rape shield law, the victim's past sexual history with the defendant is admissible if it is material to a fact at issue and is not inflammatory or overly prejudicial. R.C. 2907.02(D). Here,

the trial court excluded the testimony of Parks finding, *inter alia*, that because the victim did not identify the date or time of the alleged sexual encounters the probative value of the statement was very low and was outweighed by the prejudicial effect. If Parks had been able to testify that the victim stated she had consensual sex for pay with Minton at or near the times alleged in the indictments, such testimony may have been admissible. As Parks stated it, however, the statement allegedly made by the victim was not of sufficient probative value to outweigh the prejudicial effect. *See State v. Gardner*, 59 Ohio St.2d 14, 18, 391 N.E.2d 337 (1979) ("Evidence that complainant had a reputation as a prostitute is not sufficiently probative of consent to outweigh the state's legitimate interest in excluding the testimony, at least where there is no suggestion in the record that financial arrangements were entered into for sexual activities in this instance."). We find no abuse of discretion and conclude that the trial court properly found the evidence inadmissible under R.C. 2907.02(D).

{¶24} As to Minton's argument that the trial court violated his Sixth Amendment rights by not allowing him to cross-examine the victim as to the alleged statement of payment for sex, we note that he failed to raise any constitutional arguments in the trial court when the court ruled on the admissibility of evidence. Thus, we apply plain error analysis to this issue.

{¶25} "A silent defendant has the burden to satisfy the plain-error rule[,] and a reviewing court may consult the whole record when considering the effect of any error on substantial rights." *State v. Davis,* 4th Dist. Highland No. 06CA21, 2007–Ohio–3944, ¶ 22, citing *United States v. Vonn,* 535 U.S. 55, 59, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002). For us to find plain error: (1) there must be an error, i.e., "a deviation from a legal rule"; (2) the error must be plain, i.e., "an 'obvious' defect in the trial proceedings"; and (3) the error must have affected "substantial rights," i.e., it must have affected the outcome of the proceedings. *State v. Barnes,*

94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Plain error not only applies to purported evidentiary violations but also to purported constitutional errors. *See State v. Butts,* 4th Dist. Hocking No. 11CA22, 2012–Ohio–571, ¶ 22 (applying plain error review to an alleged constitutional violation not objected to at the trial level).

{¶26} "Even if a forfeited error satisfies these three prongs, however, Crim.R. 52(B) does not demand that an appellate court correct it." *Barnes* at 27. The Supreme Court of Ohio has "acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Id.,* quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶27} "The rights to confront witnesses and to defend are not absolute and may bow to accommodate other legitimate interests in the criminal process." *State v. Boggs,* 63 Ohio St.3d 418, 422, 588 N.E.2d 813 (1992). In determining whether the rape shield law has been unconstitutionally applied, we must "balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." *Gardner,* 59 Ohio St.2d at 17, 391 N.E.2d 337. Ohio's rape shield law advances several legitimate interests:

> First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.

*Id.* at 17–18.

{¶28}  As we already explained, the proffered evidence that the victim had allegedly stated that Minton paid her $100 per week for sex had little probative value on the issue of consent where the statement was made several years after the incidents at issue in the indictment and where the victim did not specify when the pay for sex activities were supposed to have occurred. Thus, the trial court could conclude the State's interests outweighed the probative value of the evidence. Therefore, we find no constitutional error occurred.

### 2. The Origin of the Victim's Pregnancy

{¶29}  Next, Minton contends that the origin of the victim's pregnancy was at issue, and argues that the trial court wrongly prevented him from introducing alleged statements of the victim that certain individuals, other than Minton, were the father of her child.

{¶30}  Ohio's rape shield law prohibits any evidence of the victim's sexual history "unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender." R.C. 2907.02(D). Even if one of the enumerated exceptions applies, introduction of such evidence is permitted only if the court finds that the evidence is material to a fact at issue and that its prejudicial nature does not outweigh its probative value. *Id*. Moreover, where the contested evidence is submitted only to impeach the victim's credibility, such evidence is prohibited by the rape shield law. *State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265 (1983), paragraph two of the syllabus.

{¶31}  Here, we fail to see how the origin of the victim's pregnancy is material to a fact at issue in this case. Whether the victim was impregnated by someone other than Minton, which seems unlikely given the State's DNA evidence, has absolutely no bearing on the issue of consent - which was the defense raised by Minton in response to Count 2 of the indictment. Minton admitted to having sexual intercourse with the victim during the time alleged in Count 2,

so sexual activity was not at issue with regards to Count 2. Moreover, the origin of the victim's

pregnancy has no bearing on whether Minton and the victim engaged in sexual activities on the

other alleged dates, a fact that Minton denied at trial and advanced as a defense to Counts 1 and

3. Furthermore, Minton's trial counsel admitted during an *in camera* hearing on this matter that

the true motive in attempting to introduce the statements was to impeach the victim's credibility

or more precisely, her character for truthfulness. The rape shield law does not allow evidence to

be submitted merely to impeach the victim's credibility; and clearly the prejudicial nature of this

contested evidence outweighs its probative value. The trial court, therefore, did not err in

excluding the proffered evidence under R.C. 2907.02(D). The trial court also did not violate

Minton's constitutional rights by preventing him from inquiring of the statements upon cross-

examination of the victim. It is clear that in weighing the State's interest against the minimal

probative value of the contested evidence, no constitutional violation occurred.

### 3. False Rape Accusations

{¶32}   Next, Minton contends that the trial court erred when it refused to let him present

witnesses and to cross-examine the victim about prior rape accusations the victim had allegedly

made against her father, brother, and co-worker.

{¶33}   "False [rape] accusations, where no sexual activity is involved, do not fall within

the rape shield statute. Therefore, a defendant is permitted under Evid.R. 608(B), in the court's

discretion, to cross-examine the victim regarding such accusations if 'clearly probative of

truthfulness or untruthfulness.' However, the defendant will be bound by the answers given by

the victim." *Boggs*, 63 Ohio St.3d at 421, 588 N.E.2d 813.

{¶34}   "Where an alleged rape victim admits on cross examination that she has made a

prior false rape accusation, the trial judge shall conduct an *in camera* hearing to ascertain

whether sexual activity was involved and, as a result, cross-examination on the accusation would be prohibited by R.C. 2907.02(D), or whether the accusation was totally unfounded and therefore could be inquired into pursuant to Evid.R. 608(B)." *Id.* at paragraph two of the syllabus.

{¶35} Under *Boggs,* a defendant may inquire into the prior accusation at trial only when the prior accusation was "totally unfounded." *Id.* The defendant has the burden to "demonstrate that the accusations were totally false and unfounded." *Id.* at 423. "Hence the initial inquiry must be whether the accusations were actually made by the prosecutrix." *Id.* "Moreover, the trial court must also be satisfied that the prior allegations of sexual misconduct were actually false or fabricated." *Id.* "That is, the trial court must ascertain whether any sexual activity took place, *i.e.,* an actual rape or consensual sex." *Id.* "If it is established that either type of activity took place, the rape shield statute prohibits any further inquiry into this area." *Id.* "Only if it is determined that the prior accusations were false because no sexual activity took place would the rape shield law not bar further cross-examination." *Id.*

{¶36} *Boggs* also concluded that a defendant may not bring in, at trial, extrinsic evidence that the victim had made prior false accusations of sexual assault. *Boggs* at 422, citing Evid.R. 608(B). "[P]rior false allegations of sexual assault do not tend to prove or disprove any of the elements of rape, nor do they relate to issues of consent. Hence, they are an entirely collateral matter which may not be proved by extrinsic evidence." *Id.*

{¶37} Minton first claims that he was prejudiced because he was not permitted to question *other* witnesses about the truthfulness of the victim's past accusations. On this issue, the case law established by *Boggs* is clear: Only the victim may be cross-examined regarding the false allegations; and no extrinsic evidence of these prior allegations is permitted. Thus, the trial

court did not err by disallowing Minton to question other witnesses about the truthfulness of the victim's past accusations.

{¶38}   The trial court also did not err in precluding the cross-examination of the victim regarding the alleged false accusations, because Minton failed to prove that the victim ever made the accusations. *Boggs* does not mandate trial courts to permit even *in camera* questioning of the victim or other witnesses regarding alleged false accusations of sexual activity in the complete absence of evidence that the victim even made an accusation. *State v. McKinney*, 10th Dist. Franklin No. 13AP-211, 2013-Ohio-5394, ¶ 37.[7] Here, there is no evidence that the victim ever stated that she was raped by anyone other than Minton, or that she engaged in sexual activity with someone other than Minton. The witness that Minton cites in his appellate brief for the proposition that the victim made accusations that her father and brother raped her, actually testified, *in camera*, that the victim never stated that she was raped by her father or brother or that she engaged in any sexual activity with her father or brother. Another witness testified *in camera* that the victim had told her that her father had "messed around" with her, but denied that the victim ever told her that her father raped her. There was no indication that the "messed around" testimony was even sexual in nature. A third *in camera* witness testified that there was a rumor that the victim and one of her co-workers had engaged in sexual activity. However, the witness admitted that the victim never told her directly that there was sexual activity between her and the co-worker. Moreover, the co-worker also testified *in camera* that the victim never made any accusations to him "face to face", and that the rumors were heard by coworkers. Based on this record, Minton did not prove that the victim ever made any accusations of sexual abuse or sexual activity with her father, brother, or co-worker, let alone false ones.

---

[7] We note that defense counsel agreed with this proposition of law at trial.

{¶39}  Finally, with regards to the alleged accusation concerning her brother, even if we were to assume the victim made an accusation, Minton still failed to prove that the accusation was totally false or unfounded. Rather, at an *in camera* hearing held prior to trial, evidence was established that the victim and the brother had engaged in consensual sex. Under *Boggs*, once it is established that sexual activity actually took place, further inquiry into the accusation is prohibited by the rape shield law. Stated in the alternative, "[o]nly if it is determined that the prior accusations were false because no sexual activity took place would the rape shield law not bar further cross-examination." *Boggs* at 423. The defense accepted this proposition of law at trial, noting, "we're not asking about the brother because there's a question about whether that's false."

{¶40}  Based on the foregoing reasons, we conclude that the trial court did not abuse its discretion by not allowing Minton to present witnesses or to cross-examine the victim, even *in camera*, about prior rape accusations the victim had allegedly made against her father, brother, and co-worker.

{¶41}  Minton's assignments of error one through four are overruled.

### B. Admissibility of School Calendar Exhibit

{¶42}  In his fifth assignment of error, Minton contends that the trial court erred by admitting as evidence an exhibit depicting a school calendar for the 2007-2008 academic year. Minton made a timely objection to the admission of the calendar at trial, and renews his objection on the basis that the calendar should have been excluded as "not properly authenticated and/or hearsay."

{¶43}  Kenneth Dick, an investigator for the Adams County Prosecutor's Office, testified at trial that he had received as part of his investigation a 2007-2008 school calendar for the

school that the victim attended that year. He further testified that the calendar introduced at trial, marked as State's Exhibit 10, was in fact the document he received during his investigation. The calendar was introduced to support the State's allegations in Count 1 of the indictment that the victim was raped during her Thanksgiving break from school. The trial court admitted the calendar, over Minton's objection, under Evid.R. 902(1), 902(4), and 803(6).

{¶44} The exhibit consists of a one-page computer generated printout, and is signed by "Tina Osman". A handwritten note indicates that the document is "a copy of the original document". The document is notarized and contains a notarial seal, but does not contain a seal from the school district or any other public agency.

{¶45} The admission or exclusion of evidence generally rests within the trial court's sound discretion. *State v. Green,* 184 Ohio App.3d 406, 2009-Ohio-5199, 921 N.E.2d 276, ¶ 14 (4th Dist.). Thus, an appellate court will not disturb a trial court's ruling regarding the admissibility of evidence absent a clear showing of an abuse of discretion with attendant material prejudice to defendant. *Id.* As mentioned previously, an abuse of discretion implies that a court's attitude is unreasonable, arbitrary, or unconscionable.

{¶46} Evid.R. 901 provides that authentication or identification of a piece of evidence is a condition precedent to the admissibility of that evidence. Evid.R. 902 lists certain items that are self-authenticating so as to negate the need for any extrinsic evidence in support of the item's admissibility. Here, because the calendar is a notarized document, extrinsic evidence of its authenticity is not required pursuant to Evid.R. 902(8).[8] Thus, Minton's authentication argument is without merit.

---

[8] Under Evid.R. 902(8), "[d]ocuments accompanied by a certificate of acknowledgment executed in the manner provided by law by a notary public or other officer authorized by law to take acknowledgments" do not require "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility * * *."

{¶47}  Next, Minton argues that the calendar is hearsay evidence, and that none of the hearsay exceptions apply. Conversely, the State contends that the calendar is a business record and falls under the business record exception to the hearsay rule.[9] As mentioned above, the trial court determined that the school calendar was admissible under the business record exception.

{¶48}  We agree with Minton that this document is hearsay that does not fall within any of the Evid.R. 803 exceptions. Specifically, the document is not a business record because there is no indication that it was prepared during the ordinary course of business contemporaneously with the events recorded. *See* Evid.R. 803(6) (record must be made at or near the time of the event and kept in the course of a regularly conducted business activity). Moreover, the business records exception to the hearsay rule requires that an individual with personal knowledge of the events in question make the record. *See* Evid.R. 803(6). Here, while the document was attested to by "Tina Osman", there is no indication in the record as to whom Tina Osman is, or how she would have personal knowledge of the purported business record. Given these circumstances, we cannot say that the document falls within the Evid.R. 803(6) exception.

{¶49}  Nonetheless, even though the trial court should not have admitted the calendar, we cannot find that the trial court's ruling prejudiced Minton. The State presented other significant and admissible evidence establishing a timeline of events in regards to the allegations contained within Count 1. Specifically, the victim testified that she was raped during her Thanksgiving break from school, but prior to Thanksgiving dinner. Furthermore, the State and

---

[9] The business record exception is contained within Evid.R. 803(6). Evid.R. 803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Minton stipulated to the admittance of Minton's work record from the time in question, which established that Minton was in town until at least the day before Thanksgiving day. Thus, even without the calendar, the jury had more than substantial evidence upon which to find Minton guilty of the offense under Count One; and any arguable error by admitting the document into evidence was harmless beyond a reasonable doubt. *See State v. Kidder,* 32 Ohio St.3d 279, 284, 513 N.E.2d 311 (1987) (stating that error admitting hearsay was not prejudicial when remaining evidence was "so overwhelming that the admission of those statements was harmless beyond a reasonable doubt"); *see also State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37 (clarifying the harmless-error standard to be used by appellate courts). Accordingly, we overrule Minton's fifth assignment of error.

## C. A Defendant's Right to Testify

{¶50}   In his sixth assignment of error, Minton contends that the trial court erred and violated his due process right to testify on his own behalf, when it did not permit him to deny raping the victim during his direct examination.

{¶51}   A defendant in a criminal case has the due process right to take the witness stand and to testify in his or her own defense. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). "Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right." *Brooks v. Tennessee*, 406 U.S. 605, 612, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).

{¶52}   A defendant's right to testify is not without limitation, however, and " 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' * * * But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to

the purposes they are designed to serve." *Rock* at 55-56, quoting *Chambers v. Mississippi*, 410

U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

{¶53} In the case sub judice, Minton elected to testify on his own behalf. Near the end of

his direct testimony, defense counsel attempted to ask him the following questions:

Q      Mr. Minton, did you rape [the victim] on the date * * *

Q      Did you engage in the conduct that has been testified to in this courtroom

for the last three or four days with [the victim] by the State's witnesses?

Following each question, the State objected, and the trial court sustained each objection. During

the exchange, the trial court told the jury to "disregard any response and you shall not speculate

to what the answer * * * would have been." Eventually, the trial court did permit Minton to

answer "yes" to the question: "Do you deny the charges that have been filed against you?"

{¶54} Under these circumstances, we determine that Minton was permitted a full and

complete opportunity to present a defense, and thus, his constitutional right to due process was

not violated. While the trial court may have restricted the form of the question, ultimately

Minton was permitted to deny the allegations against him. The trial court's actions were not

arbitrary because the court intended to prevent the witness from providing an opinion as to a

legal conclusion. *See* Evid.R. 701, staff notes ("Ohio has long adhered to the general rule that

only facts can be given in evidence by a non-expert witness, leaving the necessary and natural

deductions from those facts to be made by the jury. The general rule precludes the non-expert

witness from testifying as to opinions, inferences, impressions, or conclusions which he draws

from the facts he has observed."). Accordingly, Minton's sixth assignment of error is overruled.

### D. Prosecutorial Misconduct

{¶55} In his seventh assignment of error, Minton contends that the prosecuting attorney made three comments in closing arguments that resulted in prosecutorial misconduct. Thus, he argues that his convictions should be reversed. Notably, Minton did not raise a single objection in the trial court to any of the statements he now alleges resulted in misconduct.

{¶56} This Court previously set forth in *Wellston v. Horsley*, 4th Dist. Jackson No. 05CA18, 2006-Ohio-4386, the standard that applies when evaluating claims that the prosecutor engaged in misconduct by improperly commenting in closing argument. In that case we stated the following:

The Supreme Court of Ohio has admonished us that prosecutorial misconduct constitutes reversible error only in " 'rare instances.' " *State v. Keenan* (1993), 66 Ohio St.3d 402, 405, 613 N.E.2d 203, quoting *State v. DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d. 542. "The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." *State v. Jackson* (2001), 92 Ohio St.3d 436, 441, 751 N.E.2d 946. "The test for prejudice regarding prosecutorial misconduct * * * is ' "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." ' " *State v. Hartman* (2001), 93 Ohio St.3d 274, 295, 754 N.E.2d 1150 (quoting *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 and *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883). To establish prejudice, an accused must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. *State v. Loza* (1994), 71 Ohio St.3d 61, 83, 641 N.E.2d 1082. An appellate court must examine the prosecution's closing argument in its entirety to

determine whether the remarks prejudiced the defendant. *State v. Treesh* (2001), 90 Ohio St.3d 460, 466, 739 N.E.2d 749; *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203. It amounts to a de novo independent review.

During closing arguments, the prosecution is given wide latitude to convincingly advance its strongest arguments and positions. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 90, 656 N.E.2d 643; *Treesh,* 90 Ohio St.3d at 466. Nevertheless, the prosecutor must avoid going beyond the evidence presented to the jury in order to obtain a conviction. See, e.g., *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. "[P]rosecutors must be diligent in their efforts to stay within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." *State v. Fears* (1999), 86 Ohio St.3d 329, 332, 715 N.E.2d 136.

When in a case like this, a defendant fails to object to the prosecutor's alleged misconduct, he waives all but plain error.[10] See Crim.R. 52; *State v. Hartman* (2001), 93 Ohio St.3d 274, 294, 754 N.E.2d 1150; *State v. Ballew* (1996), 76 Ohio St.3d 244, 254, 667 N.E.2d 369. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost of caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. See, e.g., *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240; *State v. Hill* (2001), 92 Ohio St.3d 191, 196, 749 N .E.2d 274. Plain error should not be invoked unless it can be said that, but for the error, the outcome of the trial would clearly have been otherwise. See, e.g., *State v. Jackson* (2001), 92 Ohio St.3d 436, 438, 751 N.E.2d 946; *State v. Sanders* (2001), 92 Ohio St.3d 245, 263, 750

---

[10] Minton, like the defendant in *Horsley*, did not object at trial to the alleged misconduct.

N.E.2d 90.

*Horsley* at ¶¶ 20-22.

{¶57}   First, Minton claims that the following comment about the victim's mother was improper: "This woman is the one that wanted to give this baby up for adoption. And I'll leave that to you to determine why that would be." Minton argues that this comment was intended to demean the mother and to sway the jury, because the mother had testified at trial that the victim was not trustworthy.

{¶58}   We do not believe this comment to be improper. The comment was supported by evidence, namely the testimony of Dr. Shower, who recounted from her medical records that the victim's mother was upset that the then thirteen year-old victim was pregnant. Specifically, the medical record recounted by Dr. Shower indicated that "family still very upset with diagnosis, but all except patient's mom would consider keeping baby. Mom wanting her to put baby up for adoption." Nor do we believe the comment to be outlandish or an attempt to demean the mother. Rather, we think it is reasonable, and not necessarily a negative reflection of the victim's mother, to assume that she was upset by the prospect of her thirteen year-old daughter caring for a newborn baby.

{¶59}   Next, Minton claims that the prosecutor improperly attempted to "gain sympathy" for the victim, and "mischaracterize[ed]" evidence in the record, by saying that the victim was in "special education classes." However, the victim did testify that she was in special education classes at the time of the first alleged sexual encounter. Thus, the comment was based upon the testimonial record and did not go beyond the acceptable bounds of argument.

{¶60}   Even if we were to assume that the above two comments were improper, we fail to see their prejudicial nature. In this case, the trial judge gave extensive instructions to the jury.

Included in those instructions was the directive that: "The evidence does not include, I repeat the evidence does not include the * * * closing arguments of counsel. The * * * closing arguments of counsel are designed to assist you. They are not evidence." " 'A presumption always exists that the jury has followed the instructions given to it by the trial court.' " *State v. Murphy*, 4th Dist. Scioto No. 09CA3311, 2010-Ohio-5031, ¶ 81, quoting *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph four of the syllabus. Given the trial court's instructions, we cannot say that the above comments prejudiced Minton and denied him a fair trial, let alone that they changed the outcome of the trial.

{¶61} Finally, Minton claims the following statement expressed the prosecutor's personal opinion and improperly suggested that they jury should feel like they were the victim:

> We talked in voir dire about reasonable doubt. Defense counsel talked to you about it too. Relying on the most important of your own affairs. And I think everybody, everybody in this courtroom will probably agree, our children are our most important of our personal affairs. And we've all put our kids to school. And most of us have put those kids on school bus. What do we know about that school bus? It's yellow and it has wheels. But we're pretty firmly convinced that our kids are going to get to school safely. What do you know now about this case that you didn't know on Monday? You know more than you would ever know about that school bus. And guess who the bus driver is, Kelly Minton.

Minton claims that the statement was "egregious on its face", was compounded by the fact that Minton testified that he was once a school bus driver, and "went beyond anything reasonable and constitutes plain error requiring the convictions on all counts to be reversed."

{¶62}  This Court has previously reviewed similar comments made in closing argument for prosecutorial misconduct under a plain error analysis. Like here, in *State v. Purdin*, 4th Dist. Adams No. 12CA944, 2013-Ohio-22, the State attempted to analogize the concept of proof beyond reasonable doubt to placing children on a school bus. Specifically, the State's remarks in *Purdin* were as follows:

> [T]he burden on the State was beyond a reasonable doubt. Let's talk about that for just a minute. You're gonna get a jury instruction that says proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing rely to [sic] and act upon it in the most important of his or her own affairs.
> * * *
> I'll give you an example[,] you've either placed a child on a school bus [,] or you've ridden a school bus most likely sometime in your life[,] but what did you know about the school bus? A little more than it's yellow[,] you've got * * * you don't have any knowledge of the driving record of the driver [,] what kind of night he might have had leading up to his day[,] whether he got enough sleep[,] the maintenance record of the bus[,] you don't know anything much more than it's yellow[,] yet your parents put you on that bus, or you've put a child on that bus[,] because they, in the most important of your affairs, and you were firmly convinced that they would arrive safely.

> That is what reasonable doubt is[,] it's proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs. I give you that illustration, because you know so little about a bus

involving your children, or your parents about you[,] yet you know so much more

about Rocky Purdin's conduct on December 5th, 2010.

*Purdin* at ¶ 47.

{¶63}   The appellant in *Purdin* argued that the prosecutor's school bus analogy was highly improper and prejudicial. *Id*. at ¶ 48. We ruled, however, that even assuming the remark was improper; it did not amount to plain error because we were unable to conclude that the appellant "would not have been convicted in the absence of the improper comments." *Id*. at ¶ 49.

{¶64}   Here, while the remark may have been regrettable and possibly improper, especially given Minton's past employment as a school bus driver, we likewise conclude that it does not amount to plain error. It simply cannot be said that this single remark, when viewed in the context of the entire trial, materially prejudiced Minton or clearly changed the outcome of trial.

{¶65}   Accordingly, for the reasons stated above, we overrule Minton's seventh assignment of error.

### E. Sufficiency of the Evidence

{¶66}   In his eighth assignment of error, Minton contends that the trial court erred when it overruled his Crim.R. 29 motions for acquittal on Counts 1 through 3. Specifically, he argues that the State failed to present sufficient evidence on the element of force.

{¶67}   During trial, upon the close of the State's case, and again at the conclusion of all the evidence, Minton moved for acquittal under Crim.R. 29(A), arguing that the State presented insufficient evidence of force. The trial court granted acquittal as to Count 4 of the indictment, but denied his request as to Counts 1 through 3.

{¶68} Under Crim.R. 29(A), a defendant is entitled to acquittal on a charge against him "if the evidence is insufficient to sustain a conviction * * *." Whether a conviction is supported by sufficient evidence is a question of law that we review de novo. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *State v. Allah*, 4th Dist. Gallia No. 14CA12, 2015-Ohio-5060, ¶ 8. In making this determination, we must determine whether the evidence adduced at the trial, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *State v. Davis,* 4th Dist. Ross No. 12CA3336, 2013–Ohio–1504, ¶ 12. "The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *Id.,* citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion the trier of fact did. *State v. Tibbetts,* 92 Ohio St.3d 146, 162, 749 N.E.2d 226 (2001); *State v. Treesh,* 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

{¶69} Minton was charged in Counts 1 through 3 of the indictment with rape. In Count 1, Minton was alleged to have violated R.C. 2907.02(A)(1)(b) which states: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." In Counts 2 and 3, Minton was charged with rape in violation of R.C. 2907.02(A)(2), which states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶70} R.C. 2901.01(A)(1) defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Moreover, "[t]o prove the

element of force in a rape case involving a minor child when the offender stands in loco parentis, the force need not be physical or brutal." *State v. Shadoan*, 4th Dist. Adams No. 03CA764, 2004-Ohio-1756, ¶ 19. "Instead, the parent's [or a person who stands in loco parentis] position of authority and power, in relation to the minor's vulnerability, creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary." *Id*. As the Supreme Court of Ohio explained:

> The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength.

*State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus.

{¶71} "Thus, when the rape involves a child and that child's parent, or person who stands in loco parentis, subtle and psychological forms of coercion sufficiently show force." *Shadoan* at ¶ 21. " 'As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.' " *Id*., quoting *Eskridge* at 59.

{¶72} In the case sub judice, Count 1 involves statutory rape. Thus, the State did not need to prove force as an element of the offense under Count 1. There was discussion at trial, however, indicating that it may have been necessary to prove force under the rape statute in effect at the time the offense was committed for sentencing enhancement specification purposes. Regardless of whether force needed to be proven or not as it relates to Count 1, we nevertheless

conclude that there was sufficient evidence that Minton used force or threat of force to compel sexual activity with the victim as it relates to Counts 1, 2, and 3.

{¶73}  As to Count 1 specifically, the victim testified that Minton grabbed her by the upper arms, placed her down on her back on a rug, removed her clothes, and then laid on top of her and moved back and forth and grunted until he ejaculated. The act caused the victim to bleed from her vagina immediately following the incident.

{¶74}  As to Count 2, the victim testified that Minton grabbed her just above the waist and physically lifted her onto a table, reached into her skirt and moved her underwear to the side, digitally penetrated her vagina with his fingers, and then penetrated her with his penis until he ejaculated.

{¶75}  Next, as to Count 3, the victim testified that Minton again lifted her by the waist and placed her on the edge of a table, untied her bathing suit bottom, and engaged in sexual intercourse with her.

{¶76}  Further demonstrating force to compel sex as to all counts, was the relationship between the victim and Minton, and the size differentials between the victim and Minton. The evidence established that the victim was 12 years old when Count 1 was alleged to have occurred and 13 years old when Counts 2 and 3 were alleged to have occurred. The evidence further established that the victim weighed between 101-112 pounds during the encounters, and that Minton outweighed her by approximately 80 pounds. Minton was also the victim's adopted uncle with whom the victim had regular contact, was taught to obey, and who had some authority over the victim. The victim testified that she felt scared, mad, dirty, and wanting to cry during and following the encounters. Minton also implied that the victim should not tell anyone about the encounters when he told the victim no one would believe her.

{¶77}  After viewing all of the above evidence in a light most favorable to the prosecution, we conclude that sufficient evidence exists that Minton used force or the threat of force to compel sexual conduct. A rational fact-finder could certainly conclude that the prosecution established that Minton utilized "force", whether physical, psychological, or otherwise, to compel the young victim to engage in sexual activity. Accordingly, the trial court did not err in denying the motions of acquittal as to Counts 1 through 3, and Minton's eighth assignment of error is overruled.

## F. Manifest Weight of the Evidence

{¶78}  In his ninth assignment of error, Minton contends that his convictions are against the manifest weight of the evidence. Specifically, Minton only challenges the testimonial evidence of the victim, arguing that the victim's testimony is not credible "as it relates to non-consensual, forceful sexual activity." To support his contention, Minton points to the testimony of two witnesses who testified that the victim has a reputation of untruthfulness, and to three examples of testimonial evidence that, according to him, serve to impeach the credibility of the victim.

{¶79}  In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Hunter*, 131 Ohio St.3d 67, 2011–Ohio–6524, 960 N.E.2d 955, ¶ 119.  "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence."

*Thompkins* at 387. But the weight and credibility of evidence are to be determined by the trier of fact. *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. "A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it." *Id*. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Id*.

{¶80} Here, the jury was able to observe the victim on the witness stand, and was in the best position to judge and weigh the credibility of the victim. The testimony regarding her character for truthfulness and the alleged instances of impeachment were also observed by the jury, and the jury was free to believe all, part, or none of the victim's testimony. Put simply, the jury had before it sufficient facts to ascertain the victim's credibility and to weigh it accordingly, and we will not substitute our judgment for that of the jury. Having reviewed the testimony and the other evidence adduced at trial, we do not believe that the jury clearly lost its way in convicting Minton of Counts 1 through 3 of the indictment. Accordingly, the verdict was not against the manifest weight of the evidence; and Minton's ninth assignment of error is overruled.

### G. Disqualification of the Trial Judge

{¶81} In his tenth assignment of error, Minton contends that he was denied due process when the trial judge failed to disclose that he was aware of certain facts about the victim and/or failed to disqualify himself from presiding over the trial and rape shield motions.

{¶82} At sentencing, the trial judge said the following:

This is a Court that has multiple jurisdictions. I can say without hesitation or reservation that [the victim] and her brother led the worst four or five years of their initial life of any child that I have ever seen. And I see the worst. I see

horrible, horrible things in this courtroom in the juvenile division. She and her

brother led the worst five or six … four, five, six years of their initial life of any

child or children I've ever seen. At the age of 12 she's returned to that.

Minton alleges that upon hearing the statement, he and his attorneys became aware for the first

time that the trial judge had inside knowledge of the victim's past. Minton argues that the trial

judge was aware of this information because he presides over all divisions of the Common Pleas

Court, including the Criminal Division and Juvenile Division. Finally, Minton claims that the

trial judge should have disclosed this knowledge to the parties, and/or disqualified himself from

the case because the knowledge interfered or could have interfered with his ability to make

unbiased rulings.

{¶83} Initially, we note that it is not clear from the above statement at sentencing that

the trial judge gleaned any knowledge of the victim's past from his duties with the Juvenile

Division. Rather, his statement seems to suggest that having presided over many juvenile cases,

he could easily compare the victim's past with the histories of other youths in the county. It is

just as likely that the trial judge became familiar with the victim's early life having reviewed the

records from children services. In the pre-trial stages of this case, the defense subpoenaed the

victim's and her brother's records from the Adams County Children Services. After some

controversy regarding the confidentiality of the records, the parties stipulated that the documents

be delivered to the trial court under seal for in-camera inspection. Thus, the trial judge reviewed

the victim's children services records upon Minton's request. Minton and his defense lawyers

cannot now claim that they were unaware that the trial judge may have been privy to the victim's

past history and that he should have disclosed that knowledge to the defense.

{¶84} Next, with regards to Minton's disqualification argument, we note that this Court lacks jurisdiction to consider the trial judge's failure to recuse himself. *See State v. Batty*, 2014-Ohio-2826, 15 N.E.3d 347, ¶ 11 (4th Dist.), quoting *Citizen of Hocking Cty. v. Ohio Power Co.,* 4th Dist. Hocking No. 11CA24, 2012-Ohio-4985, ¶ 18 (" '[A] court of appeals lacks jurisdiction to review [recusal] decisions.' "). "The Supreme Court of Ohio has explained that 'only the Chief Justice or [the Chief Justice's] designee may hear disqualification matters [.]' " *Id.*, quoting *Ohio Power* at ¶ 18*,* quoting *Beer v. Griffith,* 54 Ohio St.2d 440, 441, 377 N.E.2d 775 (1978). " 'Consequently, a "Court of Appeals [is] without authority to pass upon disqualification or to void the judgment of the trial court upon that basis." ' " *Id.*, quoting *Ohio Power* at ¶ 18*,* quoting *Beer* at 441–442.

{¶85} In *Batty* and *Ohio Power*, we explained that: "R.C. 2701.03 sets forth the procedure by which a party may seek disqualification. The statute requires the party seeking disqualification to file an affidavit of prejudice with the Ohio Supreme Court. This court, therefore, has no jurisdiction to pass upon this issue[.]" *Ohio Power* at ¶ 19; *Batty* at ¶ 17, quoting *Ohio Power*.

{¶86} Here, Minton did not seek recusal via the proper avenue – i.e., by filing an affidavit of prejudice with the Supreme Court of Ohio. Thus, as in the *Ohio Power* and *Batty*, we are without jurisdiction to address his argument that the trial judge erred by failing to recuse or disqualify himself. Accordingly, Minton's tenth assignment of error is dismissed.

## IV. Conclusion

{¶87} Having overruled or dismissed each of Minton's assignments of error, we hereby affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J.:    Concurs in Judgment and Opinion.
Harsha, J.:  Concurs in Judgment Only as to Assignments of Error 6 and 10.
            Concurs in Judgment and Opinion as to Remaining Assignments of Error.


For the Court


BY: _____
        Marie Hoover, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**