[Cite as *State v. Gipson*, 2026-Ohio-1707.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

STATE OF OHIO,                    :        Case No.  25CA24

    Plaintiff-Appellee,          :

    v.                            :        <u>DECISION AND</u>
<u>JUDGMENT ENTRY</u>

STETSON L. GIPSON,               :

    Defendant-Appellant.         :        **RELEASED 5/6/2026**

_____

<u>APPEARANCES</u>:

Jon R. Sinclair, Cincinnati, Ohio, for appellant.

David Yost, Ohio Attorney General, and Andrea K. Boyd, Special Prosecuting Attorney, Assistant Attorney General, Columbus, Ohio, for appellee.
_____

Hess, J.

**{¶1}** Stetson L. Gipson appeals his conviction following a jury trial on one count of aggravated burglary. Gipson contends that his conviction was against the manifest weight of the evidence because it did not support a finding that he trespassed into the residence or that he was present at the residence. He also contends he received ineffective assistance of counsel because his trial counsel failed to object to several hearsay statements made by a witness.

**{¶2}** We find that Gipson's conviction was not against the manifest weight of the evidence because several witnesses testified that they saw Gipson assault the victim and that he did not have permission to be in the apartment. We also find that he did not receive ineffective assistance of counsel because the statements he argues should have been

objected to were not hearsay. We overrule Gipson's assignments of error and affirm the trial court's judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶3}   The Lawrence County grand jury indicted Gipson with one count of aggravated burglary in violation of R.C. 2911.11(A)(1), a first-degree felony. He pleaded not guilty, and the matter proceeded to a jury trial.

{¶4}   Corporal Jeff Mullins with the Lawrence County Sheriff's Office testified that at 5:18 p.m. he was dispatched to an apartment complex on a reported burglary. Corp. Mullins spoke to Brandon Gannon and Jaren Duncan.[1] Gannon was agitated and upset and had blood on his face and lips and dried blood down the front of his shirt. Duncan also appeared agitated. Corp. Mullins believed the two were living together and were involved in a romantic relationship.

{¶5}   The two reported that Jaren Duncan had taken her two children and Gannon's child to a playground near the apartment at approximately 4:30 p.m. that day and while they were out, Gannon stayed in an upstairs bedroom asleep. Corp. Mullins testified that Gannon reported that he had been asleep upstairs by himself, and Stetson Gipson and Cameron Cox had entered the residence without his permission and assaulted him while he was asleep in bed. Cox held his legs down while Gipson struck him, then the two left. Corp. Mullins testified that Duncan had informed him that Cox was her estranged husband and Gipson was the father of her two children. Corp. Mullins testified that Jaren Duncan told him that she had not given Stetson Gipson or Cameron Cox permission to come to her house or to come inside her house. Corp. Mullins

---

[1] Jaren Duncan went by Duncan at the time of the assault, but by the time of trial had changed her last name to Cox. For consistency, we refer to her as Jaren Duncan.

inspected the bedroom and observed a damaged mirror and damage to other furniture which indicated to him that some sort of physical altercation took place. He documented the damage by taking photographs. Photographs of the damage to the furniture, the injuries to Gannon's face, and the blood stains on Gannon's shirt were admitted into evidence. Mullins testified that Gannon appeared to have a busted, swollen lip and other facial lacerations and redness under both eyes. Corp. Mullins also inspected the front and back doors but did not see where there were any tool marks or any indication that the doors had been forced open.

{¶6}    Corp. Mullins also testified that Jaren Duncan told him that immediately after the assault Cox walked to the playground and told her "You wanted him [Gannon] gone." Gannon was trailing behind Cox, bleeding from the mouth. At about that same time, Duncan received a call on her cell phone from Gipson in which he told her nothing happened.

{¶7}    Brandon Gannon testified that he was living with Jaren Duncan on the date of the incident but was not on the lease. Gannon identified Gipson in court as the man who, along with Cox, assaulted him while he slept in bed. Gannon testified that he was asleep in bed and Duncan had taken the children to the park. Gannon testified that he woke up to find Gipson standing over top of him, "he was hitting me. I mean he fully assaulted me more than once." Gannon testified that Gipson punched him at least three times with a "full on punch" and Gannon was startled awake and shoved Gipson off him. After Gannon shoved him, Gipson took off running down the stairs and out the door. Gannon testified that Cameron Cox was with Gipson but did not assault Gannon. Cox took off when Gipson took off. Gannon testified that Jaren Duncan called law

enforcement. Gannon was aware that Gipson and Duncan had kids together and he was familiar with Gipson's physical appearance and had seen him several times before. Gannon had not seen Gipson around while Gannon was in a relationship with Duncan. Gannon testified that he lived with Duncan approximately two months at the time of the assault and during that time he never saw Gipson ever enter Duncan's apartment. Gannon testified that about two or three days after the assault, he and Duncan ended their relationship. Gannon testified that he has moved on with his life and is in a new relationship now. Gannon testified that he had a busted lip and swollen face for about a week following the assault. Gannon testified that Cameron Cox was there and witnessed the entire assault. Cox was standing at the bottom of the bed, but never physically struck Gannon. Gannon testified that he never left the apartment complex between the time of the assault and the time Corp. Mullins arrived. Gannon testified that he was aware that Duncan and Cox were married, but they were not together when Gannon moved in with Duncan. Gannon wrote a statement about the assault for Corp. Mullins. In the written statement Gannon wrote that Cox was sitting on Gannon's legs. Gannon explained that Cox was leaning over his legs and may have been trying to hold Gannon down.

{¶8} Jaren Duncan testified that her name is now Jaren Cox and was formerly Jaren Duncan. Duncan testified that she was married to Cameron Cox, but was separated from him and living with Gannon at the time of the assault. Duncan testified that neither Cox nor Gipson had permission to be in her house at the time of the assault. Duncan testified that on the afternoon of the assault, she took her two children and Gannon's child across the street to a playground so that Gannon could take a nap. Duncan testified that she went to the park at approximately 4:15 p.m. While she was at the park giving the

children a snack, she saw Cameron Cox come around the corner of the building with Gannon following him, bleeding from the mouth. Gannon was screaming "Your baby daddy and your husband think they're funny! They think they're funny!" Duncan testified that Gannon appeared to be very emotional, very angry, and out of breath and confused. Cox appeared to be very panicked, out of breath, and panting and stating that she needed to, "Tell them I let him come! Tell them I let him come!"

{¶9}     Duncan testified that she did not understand what was happening. She was in a panic and crying and the kids were scared. Duncan testified that at that point she received a phone call from Gipson who told her "Nothing happened. Everything was okay. Nothing happened." She hung up the phone and started walking back to the apartment to get the children away from the situation. Duncan also testified that Cox stated, "You have to tell them you let us come." Duncan testified that Gannon and Cox followed her as she left the park and Gannon and she went to the apartment and Cox walked past the apartment and down the county road. Duncan testified that she never saw Gipson during the entire incident.

{¶10} Duncan explained that she was very confused because of all the mixed messages from everyone:

> I was in a panic and crying at the time because my children were in the middle of all of this. And Mr. Gipson was trying to remain calm and was saying – *Nothing happened to [K.], Nothing happened. I promise nothing happened. You're fine. Everything's fine. Just walk away. Everything's fine.* And then I proceeded to hang up the phone with him, grab the hands of my children and started walking towards my apartment.
>
> I was very confused because I was being told by him [Gipson] that nothing was going on, being yelled at by Cameron to tell everyone that I let them come there, and Brandon Gannon was yelling at the same time that they think they're funny. Your baby daddy and husband think they're so funny. And he was screaming louder than Cameron and Cameron was trying to

scream over him. And then I had Mr. Gipson on the phone trying to calm me down. And the kids were, of course, crying because they were not sure what was happening. And I just found it very odd altogether because it was just very stressful and panicky.

{¶11} Duncan testified that she received a second phone call from Gipson and Cox when they were both on the phone joking around "and then the comment was made that Jesus made them do it." The second call was made after Cox started walking down the county road. Duncan testified that she was familiar with both men's voices because Cox was her husband and she had known Gipson for nine years and had two children with him, an eight-year-old and a seven-year-old. Duncan was back in her apartment waiting for law enforcement to arrive when she received the second call. When Duncan returned to the apartment she witnessed the damage in her apartment.

{¶12} Duncan testified that she had 50/50 custody of her two children with Gipson. Gannon was with her during custody exchanges and during one incident, Duncan and Gipson got into a verbal altercation and Gannon yelled for Duncan to get into the car. Gipson and Gannon exchanged curses at each other. Duncan did not believe Gipson and Gannon had a positive relationship with one another. Duncan testified that Gipson lived with his mother, stepfather, his mother's ex-boyfriend, and Gipson's two younger brothers. Duncan testified that her relationship with Gannon ended about two weeks after the assault. Currently she lives with her husband Cameron Cox, and Gipson and his wife also live with them. Duncan explained that Gipson and his wife moved in with her and her husband after "we sat down and talked and thought it was okay for him to come and at least be with his kids."

{¶13} Duncan explained that she would exchange custody of the children with Gipson by driving to his house and driving to a parking lot beside his house and exchange

the children in the parking lot. Duncan testified that Gipson never came to her apartment for the custody exchange until after Gannon moved out, "after me and Mr. Gannon had separated, um, Mr. Gipson would come over and we would do a family dinner on Sundays with our kids before we would switch back." However, Duncan testified that immediately after the assault she told Gipson that the children were staying with her, "and I told him to take me back to court because the whole incident was just a lot to handle." Duncan also testified in more detail on cross examination about her instruction to Gipson and Cox not to come to her house. Duncan testified that Cox and Gipson were both on the phone with her. Cox had started living with Gipson and the two of them were "doing everything together and he [Cox] said one day that he was going to come with Mr. Gipson to get my kids and I stated that I did not want him there."

{¶14}  Cameron Cox testified that he is married to Jaren Duncan and they live with Gipson, Gipson's wife, and Gipson and Duncan's two children together in a rented house. Cox first met Gipson when Cox got together with Duncan. Cox and Gipson had also worked together. Cox was living with Gipson at the time of the assault, when Gipson was living with Gipson's mother, stepfather, his mother's ex-boyfriend, and his two younger siblings. Cox testified that on the day of the assault, he and Gipson left Gipson's house at approximately 4:30 p.m. Gipson told Cox that they were going to the store, but instead Gipson drove to Duncan's apartment. Cox testified that Gipson stopped at Duncan's apartment and because it was a Sunday, Cox did not know if Gipson "was there to pick up his kids or what was going on." They got out of the car and walked through the back door of Duncan's apartment and went upstairs. Cox testified that Gannon was sleeping in bed and then he woke up and Gipson threw Gannon into the dresser. Because Gannon

and Gipson were so close together Cox could not tell if Gipson also threw punches at Gannon. Gipson was screaming at Gannon. Gipson was on top of Gannon at one point and Gipson was the aggressor. Gannon kept telling Gipson to stop and quit. Cox left and went down to the playground to tell Duncan what was going on. A few minutes later Gannon came down. Gannon had blood coming out of his mouth and "seemed pretty mad." Cox testified that Gannon was screaming at Duncan "your baby daddy thinks he's funny." Cox understood "baby daddy" to refer to Gipson, who had fathered two children with Duncan. Cox was panicked at that time and cannot remember making a statement to Duncan that "You have to tell them that you let us come in there." Cox testified, "I can't remember, honestly. . . .because I was . . just. . . it all happened so quick and I was panicking." Cox admitted that he was scared. Cox testified that it was not his plan to go to Duncan's apartment, and he did not know what was going to happen. Cox testified that Gipson left the apartment complex in the vehicle and Cox walked down the county road. Cox testified that Gipson drove by after about five or ten minutes and picked him up. Cox testified that Gipson called Duncan and repeatedly told her that nothing happened. Cox testified that Duncan did not give them permission to be there.

{¶15} Cox testified that after Gipson picked him up they went to Walmart because Gipson told him that "we needed to go somewhere to be seen on camera." After that, Gipson drove them to his sister's house in Kentucky because Gipson wanted to get out of Ohio. They stayed there a few days and then moved back to Gipson's house. Cox eventually got back together with Duncan. Cox testified that Gipson kept telling him not to say anything about what had happened.

**{¶16}** Cox testified that he is currently friends with Gipson and does not want to be testifying against him. Gipson keeps telling Cox that he is messing with Gipson's life and the life of his kids. Gipson told Cox that the only person that was supposed to have his back was in the apartment with him, which Cox took to mean him. Cox was afraid Gipson would be mad about his testimony and he was not sure if he would try to do something or not. Cox testified that Gipson told him multiple times that Gipson did not like Gannon.

**{¶17}** Cox testified that he was originally charged with the crime, but the case was dismissed or thrown out because the prosecuting attorney said that they felt like Cox had no part in it. Cox admitted that he gave several statements to law enforcement and in each statement, he had lied about the level of his participation. First, he falsely stated that he did not go inside the apartment, then he falsely stated that he did not go upstairs. Cox stated he lied because he was afraid of getting in trouble. Cox testified that he has no anger towards Gipson and no reason to "try to take Mr. Gipson down." Cox considers Gipson "a dear friend."

**{¶18}** Paula Mullins, Gipson's mother, testified in his defense. Paula Mullins testified that she was home the day of the assault because she had been diagnosed with Covid. When she got up that morning she started tidying up the house. She got up at 9:00 or 10:00 a.m. Mullins testified about the times everyone else in the house got up that morning. Mullins testified that Gipson left her house the day of the assault at approximately 4:00 p.m. to get cigarettes and was back home by 4:30 p.m. She testified that they have security cameras around the house and Gipson was on the camera at 4:28 p.m. Mullins testified that her son left the house again around 5:30 or 6:00 p.m. to go to

his sister's house in Kentucky. Paula Mullins testified that Gipson told her that Duncan told him that she was not going to give him the children and he would have to take her to court. Mullins took a screen shot of the video camera footage that showed Gipson on the camera at 4:28 p.m. Mullins testified that she believed that they took Cox's car to go to Kentucky because Gipson's car was not running.

{¶19} Paula Mullins testified that Gipson is her son and she loves him and let him stay in her house as a 27-year-old. Paula Mullins testified that her son has never once talked to her about the case. Paula Mullins testified that the only thing she knew about the case was what she read in the police report. Mullins testified that she believes it would take about ten minutes to get to Duncan's house from her house. Mullins admitted that she can change the date and time on the video camera, "I mean, I could if I wanted to mess with my family and say, you know – Hey this happened this day. What happened? But I'm not that type of person." Mullins admitted that nobody would know if she tampered with the date and time on the camera. Mullins testified that she could not figure out how to save the video footage from that day even though she believed it would provide a complete alibi for her son because it would cost $40.00. Nobody was able to pool together the money to save the video of that day. The most she was able to do is take a screen shot of a segment that showed Gipson there at 4:28 p.m. and it shows Gipson, "He is at my . . . the front door getting ready to go out the front door . . . open the front door . . . ."

{¶20} Frank Mullins testified that the date of the assault he was living with his wife of nine years, Paula Mullins, and her son Gipson, as well as a number of other family members. Frank Mullins testified that the house has cameras and he knows how they work because "that's what I do. I set up cameras and AP access points for Walmart and

stuff like that. So, yeah, I know how the cameras work." Frank Mullins testified that they recently cancelled "some cloud thing. We were charged sixty-some dollars for camera cloud." Frank Mullins testified that he does not know why he was called in to testify. He does not recall anything that happened on the date of the assault. He did not recall Paula Mullins asking him to try to save any camera recordings from her phone. Frank Mullins testified that he believed that they had been double billed for the cloud camera storage and had paid $72.00 per month until they cancelled it.

**{¶21}** Doug Moore testified that he has a son with Paula Mullins and they live with Frank and Paula. Moore testified that during the date of the assault he was living with the Mullins and that Gipson and Cox were also living there. Moore had the ability to see the security camera footage from his phone. Moore testified that he did not have a way of saving the footage on his phone but he was in the process of trying to set that up before the date of the assault, but never got a chance to do that.

Q: Was that because of finance or was that because you didn't have the time?

MOORE: I just really didn't feel the need to get it. Now I wished I would've.

**{¶22}** Moore testified that he never talked to Paula Mullins or Gipson about getting video from the day of the assault. Moore was the one who purchased the cameras and he could have purchased a recording plan to save the recordings from the date of the assault, but just never got around to it. As a result, now all they have is one screen shot from the date at 4:28 p.m. Moore testified that Paula Mullins did not approach him and explain to him that she needed a recording plan to be able to save the video because Gipson was allegedly involved in something.

**{¶23}**  The jury found Gipson guilty of aggravated burglary and the trial court sentenced Gipson to a prison term of four to six years. Gipson appealed.

## II.  ASSIGNMENTS OF ERROR

**{¶24}**  Gipson presents the following assignments of error:

> 1. The trial court erred by entering a conviction for aggravated burglary when the manifest weight of the evidence did not support the conviction.
>
> 2. Appellant was denied the effective assistance of counsel guaranteed under the Sixth Amendment to the U.S. Constitution and thus denied his right to a fair trial.

## III. LEGAL ANALYSIS

### A. Manifest Weight of the Evidence

**{¶25}**  Gibson contends that the overwhelming weight of the credible evidence shows that he had permission to enter the residence and therefore any assault that occurred in the residence would be a misdemeanor assault, not a burglary. He argues that the collective testimony from the witnesses showed that Jaren Duncan was in a scheme with her estranged husband, Cameron Cox, to frame Gipson for aggravated burglary so that Jaren Duncan could gain child custody leverage over Gipson concerning the two children they have together.

### 1. Standard of Review

**{¶26}** In determining whether a criminal conviction is against the manifest weight of  the evidence,  we  must  review  the  entire  record,  weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that we must reverse the

conviction. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997); *State v. Hunter*, 2011-Ohio-6524, ¶ 119; *State v. Hess,* 2021-Ohio-1248, ¶ 15 (4th Dist.).

**{¶27}** To satisfy its burden of proof, the State must present enough substantial credible evidence to allow the trier of fact to conclude that the State had proven all the essential elements of the offense beyond a reasonable doubt. *State v. Smith,* 2020-Ohio-5316, ¶ 31 (4th Dist.), citing *State v. Eskridge*, 38 Ohio St.3d 56, syllabus (1988). However, it is the role of the jury to determine the weight and credibility of evidence. *State v. Kirkland,* 2014-Ohio-1966, ¶ 132. " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 2016-Ohio-3338, ¶ 17 (4th Dist.), quoting *State v. West,* 2014-Ohio-1941, ¶ 23 (4th Dist.). We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Id.*; *State v. Koon*, 2016-Ohio-416, ¶ 18 (4th Dist.).

### 2. Aggravated Burglary

**{¶28}** The State had to present enough substantial credible evidence to allow the jury to conclude that all the elements of aggravated burglary were proven beyond a reasonable doubt. R.C. 2911.11(A)(1) prohibits aggravated burglary and provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another; . . . .

**{¶29}** Gipson does not contest the "inflicting physical harm" element of the crime and appears to concede physical harm was inflicted on another. Rather Gipson focuses on the trespass element and contends that the jury's finding that he trespassed was against the manifest weight of the evidence because he had been granted permission that day to enter the premises with Jaren Duncan's husband, Cameron, so that the two of them could assault Jaren Duncan's current paramour, a man Duncan wanted out of her life and out of her apartment so that she could reconcile with her husband. He claims there was no physical evidence that he was at the scene and the entire case relied upon the testimony of witnesses who had every motivation to lie about his involvement.

**{¶30}** However, we find that the State produced evidence to prove that Gipson was there without permission. Two witnesses testified that Gipson was inside the apartment. Gannon testified that he witnessed Gipson inside his room, punching him repeatedly in the face. Cox also testified that Gipson was there and had been on top of Gannon and had thrown Gannon into the dresser. And, both Duncan and Cox testified that Gipson did not have permission to be inside Duncan's apartment. This testimony established the trespass element and the jury found that testimony credible. Although the appellate court acts as the proverbial "thirteenth" juror under the manifest weight of the evidence standard, it rarely substitutes its own judgment for that of the jury's. *Thompkins*, 78 Ohio St.3d 380, 387 (1997). The jury was free to disbelieve Gipson's mother's testimony that he left the house at 4:00 p.m. and was back by 4:28 p.m. and did not leave again until about 5:30 or 6:00 p.m. The jury had an advantage over us in assessing her credibility and the weight to afford her testimony. The weight and credibility of evidence are to be determined by the trier of fact. *Matter of R.C.,* 2020-Ohio-

1486, ¶ 57 (4th Dist.); *State v. West,* 2014-Ohio-1941, ¶ 23 (4th Dist.). "A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it." *Id.* We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility. *Id.; State v. Minton*, 2016-Ohio-5427, ¶ 79-80 (4th Dist.).

**{¶31}** Additionally, the fact that no physical evidence, such as Gipson's DNA or fingerprints, was introduced to prove he was at the residence is not detrimental to the State's case. Physical evidence, like DNA or fingerprints, is not required to sustain a conviction, and "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Cansler*, 2025-Ohio-2558, ¶ 22 (12th Dist.).

**{¶32}** Having reviewed the testimony and the other evidence adduced at trial, we do not believe that the jury clearly lost its way in convicting Gipson of aggravated burglary. Thus, the verdict was not against the manifest weight of the evidence. We overrule Gipson's first assignment of error.

### B. Ineffective Assistance of Counsel

**{¶33}** Gipson contends that his trial counsel was deficient for failing to object to hearsay statements made by Jaren Duncan. He argues that Jaren Duncan repeatedly testified that her husband approached her and stated "tell them we had permission to be there!" He argues that Jaren Duncan repeated this hearsay testimony six times. He contends that "without this repeated statement, the balance of the state's evidence and the circumstances demonstrate that Ms. [Duncan] knew prior to the assault that it was planned and she vacated the home with perfect timing so she and the kids would not be

present. This event and entrance into the home had her tacit approval, at a minimum."

He argues that these statements were admitted to prove the truth of the matter; to show

that Jaren Duncan did not have prior knowledge of the assault and did not conveniently

vacate the home so that her paramour could be assaulted without eyewitnesses.

**{¶34}** To prevail on an ineffective assistance claim, a defendant must show: "(1)

deficient performance by counsel, i.e., performance falling below an objective standard

of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for

counsel's errors, the proceeding's result would have been different." *State v. Short*, 2011-

Ohio-3641, ¶ 113, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, (1984).

Failure to satisfy either part of the test is fatal to the claim. *See Strickland* at 697. The

defendant "has the burden of proof because in Ohio, a properly licensed attorney is

presumed competent." *State v. Gondor*, 2006-Ohio-6679, ¶ 62. We "must indulge a

strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action 'might be considered sound trial strategy.'

" *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955); *State v. Pierce*,

2024-Ohio-82, ¶ 25 (4th Dist.). "Debatable strategic and tactical decisions may not form

the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as

if a better strategy had been available." *State v. Cook,* 65 Ohio St.3d 516, 524 (1992).

**{¶35}** Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by

the declarant while testifying at trial or hearing, offered in evidence *to prove the truth of*

*the matter asserted.*" (Emphasis added.) A witness is barred on hearsay grounds from

testifying as to the statements made by another only when the statement is offered to

prove the truth of the matter asserted in the statement, and only where the statement falls outside any exceptions to the rule against hearsay as set forth in Evid.R. 803 and 804. *State v. Davis*, 62 Ohio St.3d 326, 344 (1991) (admissibility of a written investigative report of the Drug Enforcement Administration not inadmissible hearsay because not offered to prove the truth of the matters contained therein, but as relevant to the knowledge and state of mind of the person in possession of the report).

**{¶36}** Here, the statement in question was not hearsay. During the trial, the trial court held a bench conference immediately after Duncan first testified that Cox approached her. During the bench conference, the State alerted the trial court that it would ask Duncan what Cox said as he ran towards her. Gipson's attorney remarked that he would object to her testimony if it turns out not to be an excited utterance. Based on Duncan's testimony, Cox came running out, "very panicked," "out of breath," and "kinda panting." It was immediately after Cox witnessed Gipson's assault of Gannon. Cox also testified that when he came running out he was panicked and scared. Therefore, Gipson's trial counsel could have determined that the statement was an excited utterance, not hearsay, and decided not to object to the statement for both legal and strategic reasons.

**{¶37}** Second, even if the statement was not an excited utterance, the statement was not being offered to prove the truth of the matter asserted. Cox's statement was not asserting a matter that could be characterized as either true or false. He was not making an assertion, but rather making a request or demand from Duncan. "An 'assertion' for hearsay purposes 'simply means *to say that something is so, e.g.,* that an event happened or that a condition existed.' (Emphasis sic.) 2 McCormick on Evidence (4 Ed.1992) 98, Section 246." *State v. Carter*, 72 Ohio St.3d 545, 549-550 (1995) (where

remarks fall into a nonassertive category, witness could properly testify as to the fact that another witness made them).

{¶38} Finally, even if we assume for the sake of argument that the remarks were hearsay, Gipson has failed to establish prejudice from his trial counsel's failure to object. Both Cox and Duncan testified that Duncan had not given Cox or Gipson permission to enter her apartment. Gipson's argument that the "balance" of the evidence at trial proved that Duncan knew about the assault before it occurred is entirely unsupported by any evidence in the record. Gipson fails to cite to anything in the record that supports his speculation that Duncan knew all along that an assault on Gannon was planned. There was no evidence that Duncan had any prior knowledge that the assault was planned or that she went to the park knowing that the assault was about to take place. Thus, the statements did not have the prejudicial effect that Gipson contends.

{¶39} We overrule Gipson's second assignment of error.

IV.    CONCLUSION

{¶40} We overrule the assignments of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        Michael D. Hess, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**